Argued and submitted March 5, 1999, reversed and remanded in part; otherwise affirmed January 26, 2000

Douglas Gerard BROWN
and Bettina Marie Brown,
*Appellants,*

*v.*

Colleen Elaine PETTINARI,
Larry D. Smith,
*Defendants,*

*and*

WESTSPAN HAULING, INC.,
a Washington corporation,
*Respondent.*

(96-CV-0099-ST; CA A100218)

994 P2d 1231

Gregory P. Lynch argued the cause for appellants. With him on the briefs were Stanley D. Austin and Hurley, Lynch & Re, P.C.

James G. Breathouwer argued the cause for respondent. With him on the brief were Ridgway K. Foley, Jr., Breathouwer & Gilman and Greene & Markley, P.C.

Before Edmonds, Presiding Judge, and Armstrong and Kistler, Judges.

KISTLER, J.

**KISTLER, J.**

The trial court ruled, on summary judgment, that defendant Westspan Hauling, Inc., was neither vicariously liable for defendant Colleen Pettinari's negligence nor independently negligent for hiring or failing to train her. The court accordingly entered judgment in Westspan's favor. We affirm in part, reverse in part, and remand.

Because this case arises on Westspan's motion for summary judgment, we state the facts in the light most favorable to plaintiffs. *See Jones v. General Motors Corp.*, 325 Or 404, 420, 939 P2d 608 (1997). Westspan is in the business of transporting mobile homes, typically for manufacturers and dealers. It arranges for truck tractors, commonly known as toters, to pick up and deliver completed mobile homes. Depending on the size of the load, the toter may be accompanied by a pilot car, which usually bears a sign stating "oversize load." *See* OAR 734-075-0035(2)(a).

Westspan owns two toters and employs drivers for them. Westspan also leases toters from "owner operators," who agree to provide the labor necessary to transport the mobile homes for Westspan. On July 10, 1995, Westspan entered into a vehicle operation contract with defendant Larry Smith.[1] Pursuant to Interstate Commerce Commission (ICC) regulations in force at the time, the contract provided that Westspan leased the toter from Smith. *See former* 49 CFR § 1057.11 (1994).[2] The contract also provided, pursuant to those regulations, that "[d]uring the term of this contract, [Westspan] shall have exclusive possession, control and use of the vehicl[e] leased hereunder * * *." *See* n 2 above. As part of the contract, Smith agreed to provide qualified labor to

---

[1] The contract was for one month but was automatically renewed unless either Westspan or Smith gave 10 days' advance notice.

[2] The regulations stated that an "authorized carrier may perform authorized transportation in equipment it does not own only under the following conditions[.]" *Former* 49 CFR § 1057.11. The regulations then set out a series of conditions, one of which is that the carrier enter into an equipment lease that provides "that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease." *Former* 49 CFR § 1057.12(c)(1). Westspan entered into the contract before the ICC was abolished in 1996. *See* Pub L 104-88, § 101, 109 Stat 803 (1995).

transport the mobile homes. The contract thus contemplated that, when requested by Westspan, Smith would provide qualified drivers for both the toter and, when necessary, arrange for a pilot car and driver.[3] The contract provided that "[s]uch driving personnel must be qualified and authorized by [Westspan]." For its part, Westspan agreed to pay Smith $1.45 per loaded mile for his labor and for the use of his toter. In addition, Westspan reimbursed Smith for the cost of any pilot vehicle required by state law.

The contract recites that Smith is an independent contractor, and Smith's affidavit states that "[o]nce the mobile home has been delivered, Westspan has no right to control when, where, how or if I transport my equipment from the delivery site."[4] Smith's affidavit also states that, if a pilot car is required, then the pilot driver's compensation for the trip terminates when the mobile home is delivered. His affidavit states that once the mobile home is delivered, "I retain no control, nor right to control, when, where, how or if the pilot driver conducts himself or herself following delivery."

On December 26, 1995, Westspan dispatched Smith to transport a mobile home from a factory in Bend, Oregon, to a storage yard in Biggs, Oregon. Smith in turn hired Pettinari to drive a pilot vehicle to accompany him. Although Pettinari's affidavit states that she was, at that time, the "sole owner of an independent contracting pilot car service known as 'Colleen's Pilot Service,' " plaintiffs introduced evidence that Smith made the down payment on Pettinari's car and paid for the insurance on it, that he taught her to drive, that she got her drivers' license in June 1995, that she began working as a pilot car driver in August 1995, and that she had not worked as a pilot car driver for anyone other than Smith. Plaintiffs also introduced evidence that Pettinari had not registered an assumed business name with the state,

---

[3] Under the contract, Smith was responsible for paying any person he hired to drive either the toter or the pilot cars and also for withholding and reporting income taxes, social security taxes, and the like.

[4] Westspan's affidavit similarly states: "Once a delivery is made, Westspan exercises no control over the owner-operator's time or activities unless and until the next job is assigned and accepted by him."

that she did not "open up any kind of business record" for her business, and that she did not advertise her business in any manner. Finally, Pettinari explained that when Westspan paid Smith for a delivery, Smith would transfer "my whole paycheck or part of my paycheck" to a personal account that she and Smith held jointly.

The trip to Biggs occurred without incident. On the trip back to Bend, Pettinari drove her car into the oncoming lane, hit plaintiffs' car, and injured plaintiffs. Plaintiffs sued Pettinari, Smith, and Westspan. They settled their claims against Pettinari and Smith, and only two claims for relief against Westspan remain.[5] Plaintiffs' first claim for relief against Westspan alleges that Pettinari drove negligently and that Westspan is vicariously liable for her negligence. Their second claim for relief alleges that Westspan negligently hired and trained Pettinari to be a pilot car driver and that Westspan's own negligence contributed substantially to plaintiffs' injuries.[6] Westspan moved for summary judgment on both claims. The trial court granted its motion, and plaintiffs appeal from the resulting judgment.

On plaintiffs' first claim for relief, Westspan does not dispute, at least on summary judgment, that Pettinari was driving negligently when she hit plaintiffs' car. Rather, it advances two separate but related reasons why it is not vicariously liable for Pettinari's negligence. Westspan argues initially that both Smith and Pettinari were independent contractors, not its employees. Plaintiffs counter that the evidence shows that Smith was Westspan's employee and that Pettinari was Smith's employee, making Pettinari Westspan's employee.[7] Westspan argues alternatively that

---

[5] Smith and Pettinari settled with plaintiffs, and plaintiffs executed covenants not to sue. Based on plaintiffs' stipulations, the trial court entered judgments of dismissal as to Smith and Pettinari.

[6] Plaintiffs' second claim for relief is not based on vicarious liability. Rather, it is based on the proposition that Westspan's own negligence in hiring and failing to train Pettinari contributed substantially to plaintiffs' injuries and that Westspan is liable for that reason alone, without regard to whether Pettinari was within the scope of her employment on the return trip to Bend.

[7] Plaintiffs phrase the question as whether Smith was Westspan's agent and Pettinari was Smith's agent, making Pettinari Westspan's subagent. Although employees are agents, not all agents are employees. *See Restatement (Second) of*

even if Pettinari were its employee, it had no right to control her once the mobile home was delivered in Biggs. Rather, it contends that Pettinari was free at that point either to serve as a pilot car driver for some other toter or to go wherever she chose. It follows, Westspan reasons, that Pettinari's job was over and that the going-and-coming rule applies to her trip home. Plaintiffs respond that the evidence would permit the jury to find that Smith and Pettinari were on a special errand for Westspan, which would make Westspan vicariously liable for Pettinari's negligence on the trip back to Bend.

■       The first issue is whether either Smith or Pettinari was an independent contractor. If either was, then Westspan may not be held vicariously liable for Pettinari's negligence. The evidence on Smith's status is mixed. The contract between Smith and Westspan recites that Smith was an independent contractor and not an employee. Moreover, Westspan hired Smith to perform a task, Smith provided his own equipment, which he leased to Westspan, and provided the labor to perform the task. Those facts suggest that Smith was an independent contractor, although none establishes his status dispositively. *See Jenkins v. AAA Heating*, 245 Or 382, 385, 421 P2d 971 (1966).

The contract, however, also gave Westspan "exclusive possession, control and use of the vehicle(s) and equipment leased hereunder." Plaintiffs reason that Westspan's right to control the vehicle implies a right to control Smith's performance under the contract. *See Little Donkey Enterprises, Inc. v. SAIF*, 107 Or App 400, 402-03, 812 P2d 25 (1991), *mod in part* 121 Or App 643, 856 P2d 323 (1993). We recognize that the language on which plaintiffs rely was included pursuant to an ICC regulation and that the ICC has explained that that language was not intended to create an employee-employer relationship. *See Little Donkey Enterprises, Inc. v. SAIF*, 121 Or App 643, 646, 856 P2d 323 (1993) (explaining the ICC's position).[8] It may be that the contract

---

*Agency* § 2, comments a & b (1958). Some agents may be independent contractors. *Id.* We accordingly use the term employee, which appears to be the concept on which plaintiffs' argument is based.

[8] In 1992, the ICC added a new subsection to 49 CFR § 1057.12(c). That subsection provides:

"Nothing in the provisions required by paragraph (c)(1) of this section [requiring that equipment leases give the lessee 'exclusive possession, control,

language, viewed in light of the ICC's explanation, did not in fact give Westspan the right to control how Smith did his job. But we cannot say, as a matter of law, that the contract does not mean what it appears to say. Rather, the ICC's explanation of its intent creates an ambiguity both as to the meaning of that provision and the nature of Smith's relationship with Westspan, which a factfinder must resolve. *See Little Donkey Enterprises, Inc.*, 121 Or App at 646 (remanding for agency to reconsider its finding that the owner-operator was the motor carrier's employee in light of the ICC's explanation).[9]

Two other related facts, viewed together, support the inference that Smith was Westspan's employee. Plaintiffs alleged that Smith was Westspan's employee, and Westspan's affidavits do not completely negate that allegation. Rather, Westspan's affidavits are qualified. They say that Westspan had no right to control Smith *after* he delivered the mobile home, implying that it had a right to control him until the delivery was made. The second fact bears on Westspan's right to control Smith after the delivery was made. The contract requires Smith to "devote [his toter] to the exclusive service of the Lessee for its transportation of commodities." If Westspan had the exclusive right to use Smith's toter, then a factfinder could reasonably infer that it also had the right to control when and how he brought the toter back to Bend. Otherwise, the toter would not be available for Westspan's next job. Contrary to Westspan's arguments, the evidence permits a reasonable inference that Westspan had the right

---

and use' of the leased vehicle] is intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee. An independent contractor relationship may exist when a carrier lessee complies with 49 USC 11107 and attendant administrative requirements."

*Former* 49 CFR § 1057.12(c)(4) (1994).

[9] The question whether Smith's and Westspan's contract made Smith an employee or an independent contractor is a question of state law. In the absence of some indication that the ICC intended to preempt state law, and the terms of the regulation do not reveal any, then what the ICC intended at most bears on the interpretation of the language the parties included in their contract. To take an obvious example, if the ICC had required that the contract include a provision stating that Westspan had the right to control Smith's performance of his job, the ICC's statement that the provision was not intended to create an employee-employer relationship could not negate the legal effect that state law would otherwise give those words.

to control Smith on both the trip to Biggs and the return trip to Bend.

The same conclusion holds true for Pettinari, although the evidence differs. Pettinari's affidavit states that she owned "an independent contracting pilot service." A factfinder could reasonably find, however, that there was a sufficient right of control to make her Smith's employee. As noted above, Smith paid for part of Pettinari's car; he taught her to drive in March 1995; she began her pilot car business in August 1995; and she drove a pilot car only for Smith. Beyond that, all indicia of an independent business were lacking. She had not registered an assumed business name, she did not keep business records, and she did not advertise. Finally, when asked how Smith compensated her, she referred to his giving her a "paycheck" periodically, a reference that implies an ongoing employment relationship. We also note that the Oregon regulations state that pilot vehicles "are considered to be under the direct control and supervision of the oversize vehicle operator." OAR 734-075-0035(10). In short, a factfinder reasonably could conclude from this evidence that Pettinari was Smith's full-time employee and thus Westspan's employee to the same extent that Smith was.[10]

Even if Smith and Pettinari were Westspan's employees, the remaining question is whether they were in the course of their work when they returned to Bend. On that point, Westspan does not appear to argue that Pettinari was hired for this job only and that her employment terminated when the mobile home was delivered to Biggs. Rather, Westspan presumably recognizes that, given the evidence of an ongoing business relationship between Smith and Pettinari, a factfinder could reasonably infer that Smith hired her

---

[10] Although plaintiffs describe Pettinari as Westspan's subagent or subservant, Mechem reasons that it is better to view a person such as Pettinari as Westspan's employee. Floyd R. Mechem, *Outlines of the Law of Agency* § 445 (1952). He explains:

"A more realistic and fundamental answer [to the question of subagency] would be to say that the helper, though hired and paid by the operator, is simply the company's servant. * * * It would be absurd to say that the company may control the driving of Jones, the operator, but not that of Smith, hired by Jones to drive the truck."

*Id.*

to work full time as his pilot car driver. Westspan's argument turns instead on the proposition that because it had no right to control Smith and Pettinari once they delivered the mobile home to Biggs, the going-and-coming rule applies: Their work was done and, in its view, they were headed home as any employee would be at the end of the day. *See Heide / Parker v. T.C.I. Incorporated*, 264 Or 535, 539, 506 P2d 486 (1973). Plaintiffs counter that because the evidence permitted a juror reasonably to find that Pettinari and Smith were still subject to Westspan's control on the return trip, the special errand rule applies. *See Wilson v. Steel Tank & Pipe Co.*, 152 Or 386, 395-402, 52 P2d 1120 (1936).

The court explained in *Krushwitz v. McDonald's Restaurants*, 323 Or 520, 528, 919 P2d 465 (1996), that "[i]n view of this court's decision in *Heide / Parker*, it is clear that Oregon's special errand exception applies only when *either* the employee was acting in furtherance of the employer's business at the time of the injury *or* the employer had the right to control the employee's travel in some respect." 323 Or at 528 (emphasis in original).[11] On this point, Westspan introduced evidence that it had no right to control either Smith or Pettinari once the mobile home was delivered. Plaintiffs, however, introduced evidence that would reasonably permit a contrary inference. As noted above, the contract between Smith and Westspan gave Westspan the exclusive right to use Smith's toter for the duration of the contract and to call upon him during that time to deliver mobile homes. A factfinder could reasonably draw three inferences from that fact, and the other facts discussed above.

First, a factfinder could infer that Westspan had the right to control when and how Smith returned the toter. Westspan's exclusive right to use the toter for the period of the contract implies a right to direct Smith when to return it to Bend so that it would be available for Westspan's next delivery. Second, a factfinder could reasonably infer that returning the toter to Bend benefitted Westspan. If the toter

[11] Earlier cases had suggested that both requirements had to be met, *see, e.g., Gossett v. Simonson*, 243 Or 16, 26, 411 P2d 227 (1966), but *Krushwitz* appears to say that either is sufficient. We need not resolve that question because we find that both requirements are met here.

were not returned, then it would not be available for the next delivery that Westspan required. Finally, because a fact-finder could find that Smith employed Pettinari full time to be his pilot car driver, it could infer that Westspan's right to control Smith included a right to control Pettinari and that her availability as a pilot car driver was as great a benefit to Westspan as Smith's and the toter's availability. On this evidence, a factfinder reasonably could infer that both of the conditions for establishing the special errand exception were present. A factfinder, of course, could draw the contrary inference, but Westspan was not entitled to summary judgment on plaintiffs' first claim for relief.[12]

■      Plaintiffs also assign error to the trial court's ruling granting summary judgment on their second claim for relief. They allege that Westspan was negligent in hiring Pettinari to drive a pilot car and in training her how to perform that job and that the facts are disputed on that point. The question whether defendant was negligent in hiring and failing to train Pettinari to operate a pilot car is relevant only if Pettinari was acting as a pilot car driver at the time of the accident. Once Pettinari and Smith delivered the mobile home in Biggs, Pettinari was no longer serving as a pilot car driver on the return trip to Bend. She was merely driving her own car. There is no evidence that Pettinari was neither qualified nor trained to do that. Even if Westspan were negligent in hiring Pettinari to drive a pilot car or in failing to train her how to do so, there is no causal connection between that negligence and the accident that caused plaintiffs' injuries.

Reversed and remanded as to plaintiffs' first claim for relief; otherwise affirmed.

---

[12] Westspan also argues that summary judgment was appropriate because the covenants not to sue Smith and Pettinari exonerated Westspan. *See* n 5 above. A release of one party operates as a release of other parties in an action only if the parties intend it to have that effect. *Stanfield v. Laccoarce,* 284 Or 651, 661-62, 588 P2d 1271 (1978). The covenants not to sue Smith and Pettinari each expressly provide that it is the intention of the parties to reserve any and all rights against any other party arising out of the accident. Those covenants did not exonerate Westspan.