Argued and submitted March 4, reversed and remanded September 5, 2013

PORTLAND COLUMBIA SYMPHONY,
*Petitioner,*

*v.*

EMPLOYMENT DEPARTMENT,
*Respondent.*

Office of Administrative Hearings
T71202; A148492

310 P3d 1139

Robyn Ridler Aoyagi argued the cause for petitioner. With her on the briefs was Tonkon Torp LLP.

Judy C. Lucas, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

Before Wollheim, Presiding Judge, and Duncan, Judge, and Nakamoto, Judge.

DUNCAN, J.

## DUNCAN, J.

Petitioner Portland Columbia Symphony seeks judicial review after an administrative law judge (ALJ) affirmed a notice of tax assessment that the Employment Department issued to petitioner. The ALJ determined that petitioner, a community orchestra, had employed musicians and had failed to pay the required unemployment taxes on their wages. In its petition for judicial review of the ALJ's order, petitioner contends that its musicians were independent contractors whose compensation was not subject to unemployment tax. We conclude that the ALJ misapplied the independent contractor statute, ORS 670.600(2), and that the order must be reversed and remanded.

## I. BACKGROUND

### A. *Facts*

We state the following facts consistently with the ALJ's factual findings and uncontroverted evidence in the record.[1] *See AGAT Transport, Inc. v. Employment Dept.*, 256 Or App 294, 296, 305 P3d 122 (2013).

### 1. *The orchestra*

Petitioner is a nonprofit organization that stages musical performances. It was originally formed by musicians in 1986, after Lewis & Clark College eliminated funding for its adjunct community orchestra. Petitioner, which operates as a 501(c)(3) organization, is overseen by a board of directors that handles budgetary issues, hires a conductor, and approves the musical programs developed by the conductor. Petitioner typically presents five different musical programs per season, with two performances of each program.

Initially, petitioner was an all-volunteer orchestra whose musicians performed for free. That changed in 1990, however, when the local musicians union, the American Federation of Musicians #99 (AFM), convinced petitioner to start paying union members who performed for the orchestra.

---

[1] Petitioner contends that certain of the ALJ's findings are not supported by any evidence in the record. We address those findings later in this opinion; for now, suffice it to say that, when viewed in context, we do not understand the ALJ's findings to be at odds with the evidence.

Since that time, the orchestra has included both volunteer members and paid AFM members. The paid members fill what are called "core" positions in the orchestra.

For many years, petitioner's core musicians worked without written contracts, but in 2005 petitioner began entering into signed agreements with those performers. The contract form had been drafted by members of the orchestra who also were lawyers. That standardized contract, titled "MUSICIAN INDEPENDENT CONTRACTOR AGREEMENT FOR CORE PLAYER," states that petitioner's "purpose" as a community orchestra is to "present a series of public classical music concerts" during a scheduled concert season, and explains that petitioner seeks to "engage as independent contractors a full complement of musicians necessary to present the concert series."[2] For their part, the musicians must agree to attend all rehearsals and concerts, prepare for rehearsals and concerts to the satisfaction of the conductor and section leaders, and abide by the terms of petitioner's written personnel policy. The personnel policy is established (and can be amended) by a committee composed of the conductor and certain musicians—namely, the section leaders and designated "personnel managers."

Petitioner's core members are paid a flat fee per "service." For each program, rehearsals and concerts are considered separate services, so core musicians are typically paid for six or seven services per program (four or five rehearsals and two concert performances). For services performed in the Portland area, the standard fee for section leaders ("first chairs") is $41 per service, and $30 for other

---

[2] The language of the contract—which expressly states that petitioner does not intend to specify the means or manner by which musicians prepare for concert presentations, but "does specify professional quality rehearsals and concert performances at the times and places designated"—is consciously directed at the statutory factors in ORS 670.600, which are discussed later in this opinion. In fact, the contract requires the musicians to agree that they meet at least three of the five requirements for an independently established business under ORS 670.600(3) and, in a paragraph following those five requirements, states that "ORCHESTRA and MUSICIAN are aware of the provisions of the law concerning independent contractors, as contained in ORS 657.040, 657.506, and ORS 670.600. ORCHESTRA and MUSICIAN believe that MUSICIAN qualifies as an independent contractor under such laws." The contractual recitation, of course, is not dispositive of the issues before us. *See Chelius v. Employment Dept.*, 258 Or App 72, 79, 308 P3d 290 (2013).

musicians ("side persons"). For services outside the Portland area, the musicians receive an additional $20 per service. Although most paid members receive the standard fee, it is possible for individual musicians to negotiate higher fees.[3]

Both by the nature of the endeavor—coordinated musical performances—and under the terms of the standardized contract and personnel policy, petitioner sets the content and scheduling of rehearsals and concerts. Petitioner's conductor, who works under contract, is the artistic director of the orchestra and makes recommendations to the board with regard to programming, including suggestions as to guest performers or soloists. It is the conductor's job to blend the skills of individual musicians into quality performances throughout the season. If a musician is not performing up to the conductor's or the section leader's standards, the personnel policy states that the musician will be notified of the performance problems and that, if the problems persist, the musician's contract will be terminated and the position will be opened for audition.

Petitioner's performance season runs from October through the following May, and includes approximately 10 concerts and 20 or 25 rehearsals (five rehearsals per program for strings, and four for other instruments). Petitioner may cancel or reschedule performances, and core musicians must agree to make a good faith effort to attend any additional or rescheduled rehearsals or concerts. The personnel policy states that rehearsals will not extend past two and a half hours, with a 15-minute break halfway through. Musicians are expected to be able to play the assigned music at the rehearsals and typically spend 40 to 60 hours practicing alone for each program. They are allowed only one planned absence from a rehearsal per season. The personnel policy provides that, in the case of an absence due to emergency or illness, the musician will not be paid for the service.

In the event that a musician cannot attend a scheduled concert, the musician must follow the procedure set forth in the personnel policy regarding absences. The policy designates two of the core musicians as personnel managers:

---

[3] For instance, a timpani player who was required to transport his drums for rehearsals and concerts was paid an increased fee to offset his transportation costs.

one for violins, and another for all other instruments. If a musician will be absent, the musician must notify the appropriate personnel manager for his or her section. The musician can elect to hire a substitute, subject to petitioner's right to review the substitute's qualifications and veto the hiring. If the musician elects not to hire a replacement, or prefers that petitioner itself hire the replacement, petitioner has the right to do so. As a practical matter, whether a replacement is even necessary depends on the section. Because of the number of violins in the orchestra, absent violinists typically are not replaced; however, musicians for the other sections of the orchestra usually are. If a replacement is hired, the replacement generally is paid directly by petitioner, at the same rate that would have been received by the contracted musician.

The musicians themselves provide almost all of the necessary equipment for their performances. Although petitioner provides sheet music for the programs, the musicians must provide instruments and music stands. In general, the musicians own their instruments, many of which were purchased for thousands of dollars and cost hundreds of dollars each year to maintain. Musicians also must decide whether it is necessary to purchase performance aids, such as recordings of the musical piece, to prepare for rehearsals and concerts.[4]

2. *Representative examples of musicians*

In the proceedings below and throughout judicial review, the parties have focused on four musicians and treated them as prototypical of the orchestra's core performers. Because the ALJ's order affirming the tax assessment is predicated on the assumption that those musicians are representative of the other paid performers, we briefly recite the ALJ's factual findings as to their particular circumstances.

---

[4] Petitioner takes issue with the ALJ's finding that "[t]he musicians, with few exceptions, require chairs" and "[t]he musicians do not provide the chairs for rehearsals or performances." According to petitioner, it does not provide chairs; rather, the venues have chairs that are available for use during practices and performances. We understand the ALJ's recitation to point out that, for the majority of musicians, the chair is not one of the musician's expenses. From what we can tell, that factual observation was not a material part of the ALJ's analysis, nor does it factor meaningfully in ours.

### a. Marty Hernandez

Marty Hernandez has been a violinist in petitioner's orchestra since 1987. She owns three violins and uses one purchased in 2003 when performing with petitioner's orchestra. She practices playing her instruments in her living room, and she deducts the expenses for violin maintenance on her tax returns. She does not keep track of her travel expenses when performing for petitioner, nor does she take tax deductions for those travel expenses.

For part of the time she was playing with petitioner's orchestra, Hernandez held a job as a property manager. She also received other income as a musician during that time. Between 1995 and 2009, Hernandez played for the Newport Symphony Orchestra. She signed a contract with the Newport orchestra and was paid a set fee, a travel fee, and mileage reimbursement for that work. In 2010, Hernandez was also paid a set fee for a couple of "gigs" that she found by networking over the Internet.

### b. Marc Bescond

Marc Bescond plays the bass in petitioner's orchestra. He did not negotiate his pay and was not aware that the fee was negotiable. His understanding was that, as a member of an ensemble, he could not deviate from the vision and interpretation of the music as explained by the conductor.

Besson purchased his bass in the early 1990s in France, and he pays to maintain the bass and bow. He does not take tax deductions for the maintenance, however, because he would incur the costs regardless of whether he performed for compensation. He practices the instrument in his own bedroom.

Until he was laid off in 2009, Bescond also worked as a music teacher for a school in the Portland area; at the time of the hearing in this case, he was seeking work as a teacher. Although he does not advertise as a musician, he has solicited work as a music instructor on Craigslist, a website on which people post classified ads. He performed for a funeral in 2009 when personally solicited by an individual, and he has also performed with the Portland Chamber

Orchestra, the Rose City Orchestra, and an orchestra in Vancouver, Washington.

### c.   John Warton

John Warton worked for petitioner for four years as a substitute trombone player. During 2009, he did not have a written contract with petitioner. When Warton's services are needed, the personnel manager for Warton's section contacts him and asks about his availability. If he works as a substitute musician, petitioner pays him directly.

Warton has three trombones, all of which he uses for personal enjoyment; one of the three he also uses for paid performances. Warton practices playing in the common areas of his home. He does not deduct his instrument repair or maintenance expenses on his tax return.

Warton does not advertise for work as a musician or maintain a business website or email address, but he does have business cards that state his name, home phone number, and the word "trombone." He looks for opportunities to play music on the AFM website, and he has played in other venues in the Portland area and as a substitute musician for a symphony in Washington State.

### d.   Betsy Hatton

Betsy Hatton plays second violin as a paid performer for petitioner, and she has also acted as an unpaid executive director for petitioner. In 2009, other than payments from petitioner, Hatton did not receive any compensation for playing her instrument. She performed at a church once in 2010, but did not sign a written contract for the performance and then donated her payment back to the church upon receiving it. She does not deduct the costs of maintaining her instrument, has no business cards, and does not advertise her services as a musician. She practices for performances in a music room in her home, but she also uses that room for other purposes, such as listening to music for her own enjoyment.

## B.  *Procedural history*

In 2009, Hernandez lost her job as a property manager. When she subsequently filed a claim for unemployment

benefits, she was required to report income that she received from all sources, including from petitioner, the Newport orchestra, and other musical performances. In the course of processing her claim, the Employment Department investigated whether to classify her income from petitioner as "wages" for purposes of unemployment taxes and benefits. *See* ORS 657.040(1) ("Services performed by an individual for remuneration are deemed to be employment subject to this chapter unless and until it is shown to the satisfaction of the Director of the Employment Department that the individual is an independent contractor, as that term is defined in ORS 670.600."). The department's investigator interviewed Hernandez and Bescond, and concluded that both musicians were employees of petitioner rather than independent contractors. Based on that conclusion, the investigator further concluded that *all* of petitioner's core musicians were employees and that petitioner's payments to those musicians constituted wages subject to unemployment taxation. Because petitioner had not paid unemployment taxes on payments to its musicians, the department issued a notice of tax assessment for unemployment contributions for 2009.

Petitioner contested the tax assessment and requested a hearing before an ALJ. The issue before the ALJ was whether petitioner's musicians satisfied the test for an independent contractor set forth in ORS 670.600(2). That section provides that, for purposes of ORS chapter 657 (unemployment insurance), an "independent contractor" is a person who provides services for remuneration and who, in the provision of the services:

"(a)   Is free from direction and control over the means and manner of providing the services, subject only to the right of the person for whom the services are provided to specify the desired results;

"(b)   *** [I]s customarily engaged in an independently established business;

"(c)   Is licensed under ORS chapter 671 or 701 if the person provides services for which a license is required under ORS chapter 671 or 701; and

"(d)  Is responsible for obtaining other licenses or cer-
tificates necessary to provide the services."

ORS 670.600(2). Petitioner had the burden to establish that
its musicians met each of the relevant, conjunctive criteria.
ORS 657.683(4).

After a hearing at which the department's investi-
gator and the four musicians mentioned above—Hernandez,
Bescond, Warton, and Hatton—each testified, the ALJ
issued an order affirming the department's notice of tax
assessment. In her order, the ALJ reasoned that, under the
facts recounted above, petitioner failed to demonstrate that
the musicians met the relevant criteria set forth in ORS
670.600(2).

## II.  ANALYSIS

On judicial review, the parties focus on two of the
four criteria for independent contractor status: whether the
musicians were "free from direction and control over the means
and manner of providing the services," ORS 670.600(2)(a),
and whether they "customarily engaged in an independently
established business," ORS 670.600(2)(b). We likewise devote
our analysis to the ALJ's application of those two criteria,
reviewing the order for errors of law and substantial rea-
son. *See* ORS 657.684 ("Judicial review of decisions under
ORS 657.683 shall be as provided for review of orders in
contested cases in ORS chapter 183 ***."); *Freeman v.
Employment Dept.*, 195 Or App 417, 421, 98 P3d 402 (2004)
(providing that, pursuant to ORS 183.482(8)(a) to (c), the
court reviews findings of fact for substantial evidence and
legal conclusions for substantial reason and errors of law).
Although we defer to the ALJ's factual findings, as set out
above, the "ultimate determination—whether a particular
person is an employee or independent contractor—is a ques-
tion of law," *AGAT Transport, Inc.*, 256 Or App at 301. And,
for the reasons described below, we conclude that the facts
found by the ALJ do not support her legal conclusions con-
cerning ORS 670.600(2)(a) and (b).[5]

---

[5] Although the ALJ also concluded that the musicians failed to meet another
criterion, ORS 670.600(2)(d), the Employment Department does not attempt to
defend that reasoning on judicial review. ORS 670.600(2)(d) requires that the per-
son providing services be "responsible for obtaining other licenses or certificates
necessary to provide the services." The ALJ reasoned that there was no evidence
that the musicians had filed for businesses licenses with the City of Portland, and

## A. Direction and control

The first prong of the independent contractor inquiry,

"determining whether a certain individual meets the statutory criterion of being 'free from direction and control over the means and manner of providing the services, subject only to the right of the person for whom the services are provided to specify the desired results,' ORS 670.600(2)(a), also involves a legal question; it is not a pure question of fact."

*AGAT Transport, Inc.*, 256 Or App at 301 (citing *Avanti Press v. Employment Dept. Tax Section*, 248 Or App 450, 456, 274 P3d 190 (2012)). In *AGAT Transport, Inc.*, we described the legal principles at play when assessing "direction and control":

"The statutory 'direction and control' test addresses two aspects of a person's work: the means and the manner by which the person provides services. ORS 670.600(2)(a). An administrative rule defines 'means' as 'resources used or needed in performing services.' OAR 471-031-0181(3)(a)(A). To be free from direction and control over the means of providing services, a person 'must determine which resources to use in order to perform the work, and how to use those resources.' *Id*. The rule also defines 'manner,' stating that the word means 'the method by which services are performed.' OAR 471-031-0181(3)(a)(B). To be free from direction and control over the manner of providing services, a person 'must determine how to perform the work.' *Id*.

"* * * * *

"* * * In considering whether a purported employee is 'free from direction and control over the means and manner

that "the City of Portland prohibits persons from doing business within the city limits unless that individual has a business license. Portland City Code (PCC) § 7.02.300(A)." It appears that the ALJ was relying on an outdated version of the city code; in 2008, the city eliminated the requirement that a person obtain a business license before doing business, *see generally Proctor v. City of Portland*, 245 Or App 378, 263 P3d 1099 (2011), *rev den*, 351 Or 649 (2012) (describing 2008 revisions to Portland's business license law). More over, it is dubious whether a business license under the Portland City Code is the type of "necessary" license or certificate that a person providing services must be "responsible for obtaining" under ORS 670.600(2)(d), as opposed to a tax, but in any event, if the musicians otherwise met the test for independent contractor status—*i.e.*, they were free from petitioner's direction and control and were operating independently established businesses—then there would be no basis to conclude, on this record, that someone other than the musicians themselves was "responsible for obtaining" a certificate of compliance with Portland's business license tax.

of providing the services, subject only to the right of the person for whom the services are provided to specify the desired results,' ORS 670.600(2)(a), one must bear in mind that a person who is compensated for performing services virtually always will be subject to *some* level of oversight by the entity or individual for whom the work is performed. *See Avanti*, 248 Or App at 461 ('[T]he right to control test *** has never required that an "independent contractor" be free from *all* direction and control.' (Emphasis in original.)). The critical question is whether that oversight relates primarily to 'specify[ing] the *desired results*' of the work, ORS 670.600(2)(a) (emphasis added), or, instead, to having authority to control the way in which the work is performed ('the means and manner of providing the services'). In making the distinction between those two types of control, it is important to focus on the type of service performed, and consider whether it is *that* service—not the end result—over which the individual providing services is free from direction and control."

256 Or App at 301-03 (emphasis in *AGAT Transport, Inc.*).

In this case, the ALJ reasoned that petitioner, not the musicians, controlled the means and manner by which musicians provided services. The ALJ explained:

"When performing services for [petitioner] the musicians were required to attend scheduled rehearsals, wear specifically defined attire, and play the music selected by the music conductor and Board. The musicians could select the instrument to play, but could not select the type of instrument, the musical arrangement, or the work location. These factors all indicate that the musicians were under the control of [petitioner]. While the string players may exercise some discretion in how to bow a piece, the decision was made collectively, and no single player could deviate from the group decision."

In petitioner's view, the ALJ's reasoning does not adequately take into account the nature of the services that core musicians perform. Petitioner argues that the desired result—a performance by a symphony orchestra—necessarily requires coordinated efforts among the individual musicians, and the fact that musicians cannot deviate from the collective is not indicative of the right to control. We agree with petitioner.

The "direction and control" test has often required nuanced (if not imperfect) line-drawing between control over the means and manner of performance, on the one hand, and control over the results of that performance, on the other. The task is doubly difficult in this case, where the desired result *is* the performance of services. Nonetheless, we must determine whether, given the facts found by the ALJ, petitioner's oversight "relates primarily to 'specify[ing] the *desired results*' *** or, instead, to having authority to control the way in which the work is performed ***." *AGAT Transport, Inc.*, 256 Or App at 303 (emphasis in original). Viewed through that lens, we conclude that the factors that the ALJ identified as indicating control—that musicians play a particular type of instrument, play only the music selected by the conductor and petitioner's board, and show up at the work location in concert attire—relate primarily to control over the *desired result*. The gathering of musicians to play simultaneously a selected program, with particular instruments represented and performing in harmony, is what defines a symphony orchestra performance. Petitioner, by insisting that the musicians play a certain type of instrument and a particular piece of music at the time and location of the concerts and rehearsals, exercises no more "direction and control" than a property owner who insists that a builder construct the building at the location and to the particular specifications agreed upon in the bid. In other words, the constraints identified by the ALJ are not indicative of the type of direction and control in an employment relationship but, rather, flow from the very nature of the result that petitioner desires.

The remaining facts, as found by the ALJ or otherwise undisputed in the record, likewise establish that the details of the musicians' service—as opposed to the overarching performance standards—were left to the discretion of the musicians. For instance, it is undisputed that each musician chose his or her own particular musical instrument—*e.g.*, which of a musician's three violins would be best for any particular performance. Musicians discuss within their sections how to play the music; for example, members of the string section discuss bowing techniques during rehearsals and reach a consensus as to which techniques

to use. The musicians can also agree to deviate from the standard dress code if there is a theme for the performance.

In fact, apart from setting general professional standards and requiring the musicians to attend rehearsals and concerts, there is no evidence that petitioner is concerned *at all* with how its musicians spend their time practicing or preparing for performances. Each musician is expected to be able to perform at rehearsals and concerts, and to exercise judgment as to how much practice time and resources to devote to each performance. The evidence is undisputed that the average musician devotes 40 to 60 hours practicing alone for each program, and petitioner exercises no control over that aspect of the musicians' service.

For those reasons, we conclude that the ALJ erred in applying ORS 670.600(2)(a). The facts found by the ALJ, along with the undisputed evidence in the record, establish that the musicians—all of whom were similarly situated— were "free from direction and control over the means and manner of providing the services, subject only to the right of [petitioner] to specify the desired results." ORS 670.600(2)(a).[6]

B. *Independently established business*

We turn, then, to the second criterion that must be met for independent contractor status: that petitioner's musicians be engaged in an "independently established business" within the meaning of ORS 670.600(2)(b). For purposes of that statute, a person is "considered to be customarily engaged in an independently established business if any three of the following [five] requirements are met":

"(a) The person maintains a business location:

---

[6] In *Oregon Festival of American Music v. Emp. Dept.*, 204 Or App 478, 488, 130 P3d 795 (2006), we upheld an order in which the ALJ ruled that musicians hired by the petitioner were not independent contractors. We concluded, without a detailed discussion of the pertinent facts, that the ALJ's "findings are supported by substantial evidence." *Oregon Festival of American Music* does not inform our analysis; as that case itself emphasizes, the inquiry under ORS 670.600 is fact specific. *Id.* at 488 (rejecting without further discussion the argument that "a prior determination by the department that musicians performing services for a different entity, under similar but not identical facts, were independent contractors under ORS 670.600," and citing *Pacificab Co. v. Employment Dept.*, 187 Or App 693, 700, 69 P3d 774 (2003), for the proposition that "inquiry under ORS 670.600 is fact specific").

"(A)   That is separate from the business or work location of the person for whom the services are provided; or

"(B)   That is in a portion of the person's residence and that portion is used primarily for the business.

"(b)   The person bears the risk of loss related to the business or the provision of services * * *.

"* * * * *

"(c)   The person provides contracted services for two or more different persons within a 12-month period, or the person routinely engages in business advertising, solicitation or other marketing efforts reasonably calculated to obtain new contracts to provide similar services.

"(d)   The person makes a significant investment in the business * * *.

"* * * * *

"(e)   The person has the authority to hire other persons to provide or to assist in providing the services and has the authority to fire those persons."

ORS 670.600(3). Petitioner had the burden of proving that its musicians met at least three of those requirements. *See* ORS 657.683(4) (the "assessment of the director or authorized representative shall be prima facie correct and the burden shall be upon the protesting employing unit to prove that it is incorrect").

The ALJ ruled that petitioner had failed to carry its burden and that "[n]one of the musicians meets at least three of the five [criteria] for an independently established business." The ALJ reasoned that, although some of the musicians contracted with others to perform similar work or solicited other work, thereby satisfying the third criterion, none of the musicians maintained a separate business location or set aside a portion of his or her residence primarily for business purposes, bore any risk of loss, made a significant business investment, or had the ability to hire or fire. Thus, the ALJ determined that none of the musicians customarily engaged in an independently established business.

On judicial review, petitioner argues that the ALJ's order is not supported by substantial evidence or substantial reason, because all of the musicians who testified at the

hearing met at least three of the five criteria in ORS 670.600(3). The Employment Department, for its part, argues categorically to the contrary: that *none* of those representative musicians met at least three. As we will explain, the ALJ's reasoning was erroneous as to at least some of the representative musicians, and the order therefore must be reversed and remanded.

### 1. *Risk of loss*

As set out above, one of the five listed criteria is that the person providing services "bears the risk of loss related to the business or the provision of services * * *. ORS 670.600(3)(b). The ALJ ruled that the core musicians did not bear "any risk of loss related to a business" because they did not warrant their work, did not have any financial liability in the event that they failed to perform up to the standards of the orchestra (or even failed to perform at all), and did not have business insurance. According to petitioner, the ALJ's reasoning again fails to account for the nature of the work performed by the core musicians: They cannot "warrant" or "correct" their defective work, nor is it clear why they would maintain liability insurance.

We agree with petitioner that the ALJ erred in analyzing "risk of loss" by applying factors that have little relationship to the type of work that the musicians were performing. ORS 670.600(3)(b) provides:

"The person bears the risk of loss related to the business or the provision of services *as shown by factors such as*:

"(A) The person enters into fixed-price contracts;

"(B) The person is required to correct defective work;

"(C) The person warrants the services provided; or

"(D) The person negotiates indemnification agreements or purchases liability insurance, performance bonds or errors and omissions insurance."

(Emphasis added.)

Of the listed examples, the most relevant factor is the one that the ALJ did not even mention: fixed-price contracts.

All of the musicians worked for petitioner on a fixed-price contract that paid them per service, regardless of how much practice time was required. Likewise, if a scheduled performance were canceled after a musician had devoted hours of practice time, that musician would not be paid for practice time or the canceled performance. Moreover, the musicians bore the risk that their instruments would need repair or replacement during the contract term. On this record, the ALJ erred in concluding that the musicians did not bear the risk of loss related to their provision of services.

### 2. *Right to hire*

Another of the five requirements is that "[t]he person has the authority to hire other persons to provide or to assist in providing the services and has the authority to fire those persons." ORS 670.600(3)(e). As for that prong of the test, the ALJ reasoned as follows:

> "Finally, although the contract provides that the persons can hire others to perform the work, it is not customary for them to do so. When an individual cannot attend a rehearsal or performance, they contact the personnel manager, who makes the arrangements for a replacement when necessary. While individuals can be recommended by the musician as a replacement, [petitioner] retains the right to veto the selection. The musicians do not have the unqualified right to select the substitute. Neither is there any evidence that the musicians directly pay any substitutes who are used by [petitioner]. The musicians do not meet the 'authority to hire' test."

(Footnote omitted.)

We agree with petitioner that, in applying ORS 670.600(3)(e), the ALJ read requirements into the test that do not appear anywhere in the statute. First, whether a musician has the *authority* to hire and fire is a different question from whether that authority is *customarily exercised*. The statute requires the former, not the latter. Second, the fact that the musician might not directly pay a substitute is not dispositive of any issue of authority that is granted by the

contract. Third, the statute does not require, as the ALJ apparently concluded, that the right to hire and fire must be unfettered. The "veto power" in the agreement—that petitioner can review the qualifications of any proposed substitute musician—is consistent with the fact that it is a *personal services* contract. It does not fundamentally alter the nature of the musician's hiring and firing authority; in fact, the authority of a musician to *fire* the substitute musician is not subject to the veto power at all.

In short, there is no factual dispute that, consistently with the terms of the contract between petitioner and the musicians, a musician "has the authority to hire other persons to provide or to assist in providing the services and has the authority to fire those persons." In addition, it is undisputed that the musicians had the authority to hire and fire other persons to assist in providing services to petitioner, including playing coaches, "roadies," repair technicians, and drivers. Thus, the ALJ erred in concluding that the musicians failed to meet the criterion in ORS 670.600(3)(e).

### 3. *Contracted or solicited services*

As to a third requirement of the test, the ALJ concluded that at least some of the representative musicians had "provide[d] contracted services for two or more different persons within a 12-month period" or "routinely engage[d] in business advertising, solicitation or other marketing efforts reasonably calculated to obtain new contracts to provide similar services," ORS 670.600(3)(c). The Employment Department, on judicial review, does not challenge that aspect of the ALJ's ruling; we therefore presume that it was correct for purposes of our analysis.

Given that presumption, as well as our analysis con-cerning the requirements in ORS 670.600(3)(b) and (e), it follows that at least some of the representative musicians satisfied the test for an "independently established business" by meeting three of the five requirements in ORS 670.600(3). Furthermore, in light of our conclusion that the musicians were free from petitioner's direction and control, it follows that at least some of the representative musicians

should have been treated as independent contractors rather than employees for purposes of unemployment taxes. The department's notice of tax assessment, which treated *all* of petitioner's paid musicians as employees, was therefore incorrect, and the ALJ's order affirming that assessment was not supported by substantial reason. Accordingly, we reverse and remand the order.

Reversed and remanded.