Argued and submitted August 15, 2013, reversed and remanded for reconsideration April 23, 2014

PONDEROSA PROPERTIES, LLC,
*Petitioner,*

*v.*

EMPLOYMENT DEPARTMENT,
*Respondent.*

Office of Administrative Hearings
T71380; A150764

325 P3d 762

Chris Hatfield argued the cause and filed the opening brief for petitioner. With him on the reply brief was Hurley Re, P. C.

Judy C. Lucas, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Duncan, Presiding Judge, and DeVore, Judge, and Schuman, Senior Judge.*

DEVORE, J.

_____
* DeVore, J., *vice* Wollheim, J.

**DEVORE, J.**

Petitioner Ponderosa Properties, LLC, seeks judicial review after an administrative law judge (ALJ) upheld a notice of tax assessment that the Employment Department (department) issued to petitioner. The ALJ determined that 21 individuals who performed work for petitioner as cleaners and maintenance workers were employees of petitioner and that petitioner had failed to pay unemployment taxes on their wages. Petitioner contends that the individuals were independent contractors, as defined by ORS 670.600(2), whose compensation was not subject to unemployment taxation. For the reasons explained below, we reverse and remand to the department for reconsideration.

## I. BACKGROUND

We state the facts consistently with the ALJ's unchallenged factual findings and the uncontroverted evidence in the record. *McDowell v. Employment Dept.*, 348 Or 605, 608, 236 P3d 722 (2010); *Portland Columbia Symphony v. Employment Dept.*, 258 Or App 411, 413, 310 P3d 1139 (2013). Petitioner (Ponderosa) has a contract to provide rental management services to Black Butte Ranch, a real estate development in central Oregon with 1,250 individual homes and condominiums. All of the units within Black Butte Ranch are privately owned. Ponderosa coordinated rental activity for owners who wished to rent their properties to the public. Ponderosa arranged with owners to provide general maintenance and cleaning services. To provide the services, Ponderosa engaged house cleaners and maintenance workers. Twenty-one individuals—two maintenance workers and 19 cleaners—are the subject of this dispute. The department found them to be employees. Ponderosa insists that they are independent contractors.

Hayden Mayea and Bradford Livsey are maintenance workers. Ponderosa paid Mayea a flat rate of $65 per unit to shovel snow from a unit's walkway and driveway. Ponderosa would inform Mayea on Monday at which units he could shovel, and he would have to complete the work by Friday. Otherwise, Mayea could set his own schedule for shoveling the units. Mayea decided which tools to use and provided them himself, including a truck with a snowplow

to travel to the units. Ponderosa did not provide any training or require Mayea to follow any special procedures, nor did it provide him with a handbook on how to perform the work. Ponderosa did not provide a uniform or require a dress code. Mayea did not have a written contract with Ponderosa, nor did he make any formal guarantees about work quality. Ponderosa did inspect the work to ensure it was timely and satisfactorily done, and, on one occasion, did require him to return and complete the work without additional payment. Mayea could hire assistants or replacement workers without Ponderosa's approval.

Livsey also provided general maintenance services, such as setting snow stakes, cleaning decks, and replacing light bulbs. He provided his own shovels, rakes, blowers, and hammers. Livsey could choose assignments from a list prepared by Ponderosa, and he could complete them at any time, unless the unit was occupied. Ponderosa set no specific procedures for Livsey to follow, and did not give him any handbooks. Livsey was not required to follow a dress code or wear a uniform, and he generally set his own schedule. Ponderosa did inspect his work, and it could require him to correct deficient work. Livsey had authority to hire assistants or replacements without Ponderosa's consent.

The cleaners' responsibilities and relationship with Ponderosa are undifferentiated, and, following the ALJ's approach, we consider their duties collectively. Ponderosa engaged the cleaners to prepare the units for rent or for the benefit of the owners. Ponderosa sent the cleaners a schedule for the coming month, which was based on the occupancy of the units. Ponderosa identified which cleaning jobs were available to each cleaner, and each was free to accept or reject the jobs. Each normal cleaning job had a fixed, nonnegotiable price and took approximately two hours. Seasonal deep cleanings were paid at an hourly rate negotiated between Ponderosa and the cleaner. The unit owners provided some equipment and cleaning supplies, which cleaners could or, in some cases, must use. Otherwise, the cleaners used their own equipment and supplies, not Ponderosa's. The cleaners provided their own transportation to a unit. If a unit was being vacated and re-rented the same day, cleaners had a six to eight hour window of time in which to clean the unit.

Ordinarily, they were given four to six days to complete a job, and they could set their own schedule.

Ponderosa gave the cleaners information sheets, which included information such as security codes, instructions from the owners, and the location of the water heater. Ponderosa provided checklists for each room and unit, as well as more detailed spring cleaning checklists. Owners could pick tasks or specify cleaning products. Cleaners were not expected to follow these checklists, and several cleaners testified that they ignored them. Ponderosa merely expected the cleanings to be done in a professional manner. Cleaners were given periodic memoranda, called Staff Notes, with general and seasonal information and reminders, such as protocols for submitting invoices and reminders to turn off all lights in the units.

The cleaners submitted invoices for each job, reflecting the date of completion, unit number, and set rate of pay. Ponderosa then billed the unit owner. Ponderosa paid the cleaners twice per month. Because Ponderosa was responsible to owners for security, it required the cleaners to provide information on any assistants or replacements they hired, but Ponderosa's approval was not necessary. Ponderosa had no written contract with the cleaners. Following a cleaning job, Ponderosa inspected the unit, looking for omissions or damage, and could require a cleaner to correct the work without additional pay. Ponderosa would leave a "calling card" in the unit to welcome tenants, provide information, and solicit feedback.

In June and July of 2010, the department received claims for unemployment insurance benefits from two cleaners. Both reported wages from Ponderosa, but the department had no record from Ponderosa of wages paid to them. The department issued an assessment, finding that 45 individuals were employees and that Ponderosa had a taxable payroll of $171,434.06 during the period in question. The department assessed taxes and interest of $2,752.15. Ponderosa disputed the assessment and requested a hearing before an ALJ.

Prior to the hearing, the parties stipulated that 16 of the individuals were employees and eight were independent

contractors. The hearing focused on the remaining 21 individuals and the meaning of the term "independent contractor." For the purposes of ORS chapter 657 (unemployment insurance), an "independent contractor" is a person who provides services for remuneration and who, in the provision of the services:

> "(a) Is free from direction and control over the means and manner of providing the services, subject only to the right of the person for whom the services are provided to specify the desired results; [and]

> "(b) * * * is customarily engaged in an independently established business[.]"

ORS 670.600(2).[1] Those elements are conjunctive; a person is not considered an "independent contractor" unless each is met. After testimony from the department's investigator, Ponderosa's principals, and several cleaners, the ALJ sustained the tax assessment for all 21 individuals.[2] The ALJ determined that Ponderosa failed to prove that any of the individuals was free from petitioner's direction and control in the performance of his or her services. ORS 670.600(2)(a). Although that determination was dispositive, the ALJ went on to determine that seven individuals were customarily engaged in an independently established business. ORS 670.600(2)(b). Because, however, none of the individuals satisfied both elements, the ALJ affirmed the assessment as to all 21 individuals.

On review, Ponderosa argues that the ALJ erred in concluding that Ponderosa maintained "direction and control" over the disputed individuals. Ponderosa asserts that the factors relied on by the ALJ do not support his determination and that the ALJ failed to account for the "nature of the business" in making his decision. Ponderosa also argues that the ALJ's determination concerning whether the disputed individuals were "customarily engaged in an independent business" was not supported by substantial evidence and that the uncontroverted evidence demonstrates that additional individuals satisfied that element.

---

[1] The parties agree that ORS 670.600(2)(c) and (d), which pertain to licensing requirements, are not at issue in this case.

[2] The ALJ did modify the assessment as to the eight individuals who the parties stipulated were independent contractors.

We review for substantial evidence, substantial reason, and errors of law. ORS 657.684; ORS 183.482(8); *Freeman v. Employment Dept.*, 195 Or App 417, 421, 98 P3d 402 (2004). We note that the "ultimate determination—whether a particular person is an employee or independent contractor—is a question of law." *AGAT Transport, Inc. v. Employment Dept.*, 256 Or App 294, 300-01, 305 P3d 122 (2013) (citing *Schaff v. Ray's Land & Sea Food Co., Inc.*, 334 Or 94, 101 n 3, 45 P3d 936 (2002)); *see also Avanti Press v. Employment Dept. Tax Section*, 248 Or App 450, 459, 274 P3d 190 (2012). Under ORS 657.683(4), the employer has the burden of proving that the individuals met both elements. For the reasons that follow, we conclude that the ALJ erred in concluding that Ponderosa maintained "direction and control" over the individuals. We also conclude that the ALJ's determination that certain individuals were not customarily engaged in an independent business is not supported by substantial evidence or substantial reason.

## II.   DIRECTION AND CONTROL

### A.   *In General*

We begin with the first element in the definition of an independent contractor. The "direction and control" element asks whether a person receiving remuneration for services is "free from direction and control over the means and manner of providing the services, subject only to the right of the person for whom the services are provided to specify the desired results." ORS 670.600(2)(a). That issue presents a legal question and not a pure question of fact. *AGAT Transport, Inc.*, 256 Or App at 301; *see Avanti Press*, 248 Or App at 459, 466-71 (addressing "direction and control" test as legal question). The question focuses on the "means and manner" by which the person provides the services, terms that have been defined by administrative rule. "Means" is defined as "resources used or needed in performing services." OAR 471-031-0181(3)(a)(A). To be free from direction or control over the "means" of providing services,

> "an independent contractor must determine which resources to use in order to perform the work, and how to use those resources. Depending upon the nature of the business, examples * * * include such things as tools or equipment,

labor, devices, plans, materials, licenses, property, work location, and assets, among other things."

*Id.* The "manner" of providing a service is "the method by which services are performed." OAR 471-031-0181(3)(a)(B). To be free from direction and control over the manner of performing services, the independent contractor "must determine how to perform the work. Depending upon the nature of the business, examples * * * include such things as work schedules, and work processes and procedures, among other things." *Id.*

These terms do not speak in absolutes, and they do not contemplate black and white situations. Rather, ORS 670.600(2)(a) "was intended to codify the 'right to control' case law that had developed over the years—particularly, in workers' compensation cases." *Avanti Press*, 248 Or App at 460 (citing *S-W Floor Cover Shop v. Natl. Council on Comp. Ins.*, 318 Or 614, 630, 872 P2d 1 (1994)). The "right to control" test involves evaluating multiple factors to determine whether an employment relationship exists, *S-W Floor Cover Shop*, 318 Or at 622, which suggests that the "[r]ight to control is a matter of degree." *Pam's Carpet Service v. Employment Div.*, 46 Or App 675, 681, 613 P2d 52 (1980). In *Avanti Press*, we observed:

> "'Even in the purest of independent contractor situations— say, services rendered by an attorney, doctor or accountant— the client could give some instructions about where the services were to be performed.' In other words, the right to control test, which the legislature codified in ORS 670.600, has never required that an 'independent contractor' be free from *all* direction and control."

248 Or App at 461 (emphasis in original; citation omitted). In *Ponderosa Inn, Inc. v. Emp. Div.*, 63 Or App 183, 190, 663 P2d 1291, *rev den*, 296 Or 120 (1983), the court explained that to tell a painter what and where to paint was not the kind of control to which the statute refers. "Obviously a contract will specify what is to be painted and, even if impliedly, will ordinarily require that the work be done in an acceptable manner. That does not necessarily mean that there is an employment relationship." *Id.* Recognizing that some oversight may exist in an independent contractor relationship, the question becomes whether that oversight relates to

the desired results, or, instead, to the means and manner of performing the services. *AGAT Transport, Inc.*, 256 Or App at 303. "In making the distinction between those two types of control, it is important to focus on the type of service performed, and consider whether it is *that* service—not the end result—over which the individual providing services is free from direction and control." *Id.* (emphasis in original). Here, we must consider the services provided by the individuals and determine whether they are free from direction and control over the means and manner of providing those services. Doing so reveals that the ALJ misapplied the direction and control test to Mayea, Livsey, and the cleaners.

B. *Maintenance Workers*

As to Mayea and Livsey, the ALJ acknowledged that certain factors demonstrated their freedom from direction and control in providing services: They provided and selected all of the necessary tools and equipment; they had discretion in the timing of performance; they were not required to wear a uniform or follow a dress code; and they could hire assistants or replacements without Ponderosa's approval. The ALJ also found:

> "In other, more significant respects, however, [Ponderosa] maintained significant control over the means and manner of providing services. For both Mayea and Livsey, [Ponderosa] set the rate of pay each would receive for assigned work, and determined what job assignments were available to each. [Ponderosa] reviewed their work, and retained the authority to require them to complete work to its satisfaction before paying for their services."

Due to those facts, the ALJ concluded that Mayea and Livsey were not free from Ponderosa's direction and control and, consequently, failed to satisfy ORS 670.600(2)(a). Ponderosa contends that the facts on which the ALJ relied "do not support his finding that Ponderosa controlled the means and manner that Mayea and Livsey provide[] services." The department responds that the ALJ's findings were sufficient. We agree with Ponderosa.

Although the direction and control test often requires "nuanced (if not imperfect) line-drawing" between control over the means and manner of performance and

control over the results of performance, *Portland Columbia Symphony*, 258 Or App at 423, we conclude that Ponderosa's direction and control are aimed at the desired results. We examine the facts that the ALJ noted, each in turn. Ponderosa's setting the rate of pay for each job and determining which job assignments were available to each individual are not indicative of control over Mayea's snow-shoveling or Livsey's maintenance projects; rather, they are aimed at achieving a desired result—a completed assignment at the required time and at a fixed price. Ponderosa's inspection of their work and potentially requiring them to correct their work before payment are again directed at ensuring that the desired results have been achieved. *See Ponderosa Inn, Inc.*, 63 Or App at 190. Indeed, correction of defective work is a factor indicative of being customarily engaged in an independent business, ORS 670.600(3)(b)(B), and should not militate *against* an individual being an independent contractor for this element.[3] This case is similar to *Portland Columbia Symphony*, in which we explained that "the constraints identified by the ALJ are not indicative of the type of direction and control in an employment relationship but, rather, flow from the very nature of the result that petitioner desires." 258 Or App at 423. The same is true here. Accordingly, the ALJ erred in his determination that Ponderosa exercised direction and control over the means and manner by which Mayea or Livsey performed services.

## C. *Cleaners*

As to the cleaners, the ALJ's findings were mixed. The ALJ recognized certain ways that they enjoyed freedom from Ponderosa's direction and control. They worked independently on each assignment without direct supervision, and they could accept or reject any of the work opportunities offered. They generally provided their own tools and supplies for the work and could use them in whatever manner they chose. The ALJ rejected the department's argument that the information sheets, checklists, sample invoices, and staff notes constituted direction and control. The ALJ found that those materials reflect Ponderosa's specification of the

---

[3] The consideration of such facts for purposes of the independent business issue is discussed below. 262 Or App at 430-31.

desired results of the contracted work. Similarly, the ALJ reasoned that the calling cards were intended for communication with tenants, and the cards did not direct and control the means and manner of the cleaners' services. The ALJ found, however, that Ponderosa maintained significant direction and control over the cleaners based on the following facts:

> "[Ponderosa] set the rate of pay for each clean, and the rates were not negotiable. [Ponderosa] prepared a monthly list of cleans, and decided which cleans were offered to each cleaner. Perhaps most significantly, the cleaners were not authorized to negotiate directly with unit owners for cleaning jobs."

The ALJ concluded that Ponderosa failed to establish that the 19 cleaners satisfied ORS 670.600(2)(a). As before, Ponderosa contends that those facts are not logically connected to direction and control over means and manner and that those facts fail to account for the nature of Ponderosa's business. The department responds that the facts are sufficient and adds that control over the "manner" of performing services includes "work schedules." OAR 471-031-0181(3)(a)(B).

We agree with Ponderosa. The nonnegotiable rates of pay and the prepared list of cleaning jobs are not indicative of direction and control over the means and manner of providing this type of service—cleaning a unit. Rather, those facts are indicative of the results Ponderosa seeks from hiring a cleaner—that the rental unit will be clean when the tenant arrives and at a reasonable and predictable price. Likewise, Ponderosa's "work schedules" did not indicate control. Ponderosa gave the cleaners four or five days to complete the work before a deadline and would require the work to be completed in a single day only when the occupancy of a unit required it. That schedule was determined by the rental schedule, which flows from the nature of the business, and not petitioner's desire to direct or control how the cleaners performed their services.

For those reasons, we conclude that the ALJ erred in his application of ORS 670.600(2)(a) to the 19 cleaners, Mayea, and Livsey. The facts found by the ALJ, along with

the undisputed evidence in the record, establish that those 21 individuals were "free from direction and control over the means and manner of providing the services, subject only to the right of [Ponderosa] to specify the desired results." ORS 670.600(2)(a).

## III. INDEPENDENTLY ESTABLISHED BUSINESS

### A. *In General*

We turn now to the second element needed to show that an individual is an independent contractor for the purposes of unemployment insurance: Ponderosa must show that each service provider is engaged in an "independently established business" within the meaning of ORS 670.600(2)(b). Omitting the details to follow later, ORS 670.600(3) provides that

"a person is considered to be customarily engaged in an independently established business if any *three* of the following [*five*] requirements are met:

"(a)  The person maintains a business location:

"* * * * *

"(b)  The person bears the risk of loss related to the business or the provision of services * * *:

"* * * * *

"(c)  The person provides contracted services for two or more different persons within a 12-month period, or the person routinely engages in business advertising, solicitation or other marketing efforts reasonably calculated to obtain new contracts to provide similar services.

"(d)  The person makes a significant investment in the business * * *:

"* * * * *

"(e)  The person has the authority to hire other persons to provide or to assist in providing the services and has the authority to fire those persons."

(Emphasis added.)

Although the parties in some cases have designated certain individuals as representatives of a group, the parties

here did not do that. *See, e.g., Portland Columbia Symphony,* 258 Or App at 416 (using four musicians as representatives of the orchestra). The parties, however, did concur in pre-hearing stipulations. First, the ALJ acknowledged the parties' stipulation that two of the cleaners satisfied three of the criteria in ORS 670.600(3).[4] Next, based on evidence presented by Ponderosa, the ALJ determined that five other cleaners satisfied three criteria in ORS 670.600(3).[5] The ALJ also determined that one other cleaner satisfied three criteria, but he inadvertently omitted her from the ultimate findings on this element.[6] Nonetheless, as noted above, the ALJ determined that those eight individuals were not inde-pendent contractors, because none was free from Ponderosa's direction and control. In light of our holding to the contrary, those eight cleaners must be recognized as independent con-tractors. Accordingly, the status of 13 individuals remains in dispute at this point.

Ponderosa contends that "[a]ll of the persons at issue satisfied the requirements of (3)(b) [(risk of loss)], [3(c) (contracted services to others),] and 3(e) [(ability to hire others)], which means ORS 670.600(3) is satisfied." Neither party disputes the ALJ's determination that all of the ser-vice providers satisfied the criterion in ORS 670.600(3)(e), which concerns the authority of all the workers to hire and fire assistants. And Ponderosa does not challenge the ALJ's determinations pertaining to ORS 670.600(3)(a) or (d), as to particular individuals who had an independent busi-ness location or a significant investment in their business. Consequently, we confine our review to the ALJ's determi-nations concerning ORS 670.600(3)(b) and (c), which we review for substantial evidence and substantial reason. ORS 657.684; ORS 183.482(8)(c) ("Substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding."); *Salosha, Inc. v. Lane County,* 201 Or App 138, 143, 117 P3d

---

[4] Those cleaners are Julie Allen and Dawn Thatch.

[5] Those cleaners are Eileen Evan, Roger Renner, Ruth Rincon, Emilee Stoery, and Marie Libel.

[6] The parties stipulated that Sharon Sparrow satisfied ORS 670.600(3)(b) and (3)(c). The ALJ found she had authority to hire and fire assistants without Ponderosa's approval, thus satisfying ORS 670.600(3)(e).

1047 (2005) ("Where a petitioner argues that an order is not supported by substantial evidence, a court will also review the order for substantial reason to ensure that the order articulates the reasoning that leads from the facts found to the conclusions drawn.").

B. *Risk of Loss*

The "risk of loss" criterion, ORS 670.600(3)(b), concerns which party bears the risk of loss in the provision of services. That statute provides:

> "The person bears the risk of loss related to the business or the provision of services as shown by factors such as:
>
> "(A)  The person enters into fixed-price contracts;
>
> "(B)  The person is required to fix defective work;
>
> "(C)  The person warrants the services provided; or
>
> "(D)  The person negotiates indemnification agreements or purchases liability insurance, performance bonds or errors and omissions insurance."

*Id.* The factors listed are illustrative; they are not an exclusive list of things that could show risk of loss. And the factors are disjunctive. An individual is not required to satisfy all of them as if they were four elements.

The thrust of Ponderosa's argument on "risk of loss" is that the ALJ misunderstood the parties' prehearing stipulations. Those stipulations were memorialized in a letter sent to the ALJ prior to the hearing. With respect to "risk of loss," the letter states:

> "The parties agree that [Eileen Evan, Krystal Fairbanks, Roger Renner, and Sharon Sparrow] satisfied ORS 670.600(3)(b)(D) by bearing a 'financial out-of-pocket' Risk of Loss (due to having bought insurance)[.]"

(Underscoring in original.) The parties further stipulated that, excluding those individuals testifying as witnesses, or those covered by stipulations, *none of the individuals "negotiate[d] indemnification agreements or purchase[d] liability insurance, performance bonds or errors and omissions insurance."* (Emphasis added.) In his final order, the ALJ

inaccurately recited the parties' stipulations on the "risk of loss" criterion as follows:

> "(5)  Four of the service providers bore a risk of loss in providing services, satisfying the requirement of ORS 670.600(3)(b)[.]

> "(6)  Except as otherwise stipulated by the parties or determined by the ALJ, *none of the service providers identified in the Department's audit satisfied the requirement of ORS 670.600(3)(b).* "

(Emphasis added.) Later in the final order, the ALJ found, "The parties stipulated that Eileen Evan, Krystal Fairbanks, Roger Renner, and Sharon Sparrow bore a risk of loss in providing services, satisfying the requirement of ORS 670.600(3)(b)." Then the ALJ found, "The parties stipulated that none of the remaining cleaners * * * satisfied the requirement of ORS 670.600(3)(b)."

Predictably, Ponderosa contends that those findings are not supported by substantial evidence because they are based on an inaccurate understanding of the parties' prehearing stipulations. We agree. The ALJ mistook the parties' stipulations on whether other individuals purchased insurance pursuant to ORS 670.600(3)(b)(D)—one factor in the "risk of loss" criterion—as stipulations as to those others on the entire criterion. On review, it is evident that the stipulations applied to one *factor* for demonstrating risk of loss, not the entire *criterion*.

Ordinarily, when an ALJ fails to apply factors like those set out in ORS 670.600(3)(b), it is necessary to remand for reconsideration—including, possibly, further factfinding—under a correct understanding of the law. In this case, though, the parties' remaining stipulations obviate that need. The parties stipulated as follows:

> "[Ponderosa] paid all of the service providers a fixed-price amount for each work assignment. Appellant set the fixed-price to be paid for each work assignment.

> "The service providers were expected to correct any defective work before being paid."

(Paragraph numbering omitted.) The fixed-price assignments demonstrate that the cleaners bore significant risk.

Regardless of the condition of the unit or the time necessary to complete the task, they would be paid only the fixed rate. *See Portland Columbia Symphony*, 258 Or App at 426-27 (explaining that fixed-price contracts demonstrated risk of loss by musicians). The same is true of Mayea and Livsey. The risk that they all bore is underscored by the requirement to fix defective work. Thus, in light of the stipulated facts, the ALJ erred in concluding that the individuals did not bear the risk of loss related to their provision of services.[7]

When that criterion is included, at least three additional cleaners—Tracy Curtis, Tammy Gill, and Kym Hartford—meet three of the five criteria so as to be "customarily engaged in an independently established business[,]" ORS 670.600(2)(b). Consequently, those three additional cleaners are independent contractors within the meaning of ORS 670.600(2), leaving only 10 of the 21 individuals still in dispute. Those remaining 10 have been shown to satisfy two criteria (risk of loss and ability to hire), such that proof of one more criterion would make any one of the 10 an independent contractor.

C.   *Contracted Services for Two or More Different Persons*

Ponderosa challenges the ALJ's determination concerning the criterion described in ORS 670.600(3)(c). That criterion requires that an individual routinely advertises or that an individual "provides contracted services for two or more different persons within a 12-month period[.]"[8] The parties stipulated that five individuals satisfied this criterion; however, Ponderosa contends that the uncontroverted evidence demonstrates that all of the individuals satisfied this criterion.[9] At the hearing, six cleaners and a principal owner of Ponderosa testified about services to multiple customers. Charlene Sundstrom explained that she cleaned the homes of "several private clients" without a written contract

---

[7] We appreciate that fixed-price contracts and the obligation to fix defective work are two among a nonexclusive list of factors set forth in ORS 670.600(3)(b). On this record, the presence of those two factors establish "risk of loss" as a matter of law.

[8] Ponderosa does not contend that any of the service providers engaged in marketing activities or advertised for their services.

[9] Specifically, the parties stipulated that five cleaners satisfied the requirement of ORS 670.600(3)(c) and that one cleaner did not.

and for an hourly wage. Mary Jo Blanchette, a cleaner, testified that she worked for "ten private people," as well as Sisters Vacation Rentals on a contract basis. Emilee Stoery, another cleaner, testified that she had worked for "private clients" during the relevant time period at an hourly rate and without a formal contract. Roger Renner, Alexander Rincon, and Tracy Curtis provided similar statements regarding their work history.[10] The department did not offer any contrary evidence.

In his final order, the ALJ determined that ORS 670.600(3)(c) was not satisfied, reasoning that

> "Sundstrom and Rincon testified that they provided services to other individuals during the period in issue, but *there is no evidence that the services were performed as independent contractors.* Furthermore, [Ponderosa] provided no persuasive evidence that any of the other cleaners provided services to two or more individuals *as independent contractors* [during the period in issue]."

(Emphases added.) Ponderosa contends that the ALJ's determination is inconsistent with the uncontroverted testimony and that the ALJ provided no explanation for his rejection of the testimony of all the witnesses. The department insists that the ALJ was entitled to be unpersuaded.

We conclude that the ALJ misapplied ORS 670.600(3)(c) by interposing unnecessary requirements in its analysis. Although the ALJ declared that there was no evidence that the cleaners provided services to others "as independent contractors," there was nothing in these facts to suggest that any cleaner was engaged any differently with the other owners or management agencies. No one was shown to be, for example, a salaried custodian for a nearby school district. Because no such facts were presented, neither we nor the ALJ need consider whether services as a typical employee of someone else would still help to prove the service-to-others criterion. We need not decide whether, in order to show service to others, Ponderosa must prove the elements and criteria required to establish that each individual was an independent contractor as to *other* owners

---

[10] A number of other cleaners provided information on this criterion by answering questionnaires, which were entered into the record.

or management agencies. It suffices here that Ponderosa showed that a cleaner or maintenance worker provided contracted services "for two or more different persons."

Given the unchallenged testimony, the ALJ's determination may have been based on an understanding that a formal or written contract was required to show that a person provided "contracted services for two or more different persons." The statute, however, demands no such formality when showing a cleaner or maintenance worker provided service to Ponderosa's clientele and to another management agency or property owner. Contracts may be oral or written, one-time arrangements or long-time commitments. *See, e.g., Lane v. Floyd*, 213 Or App 215, 218, 159 P3d 1240 (2007), *rev den*, 344 Or 43 (2008) (oral independent contractor agreement). Sundstrom, for example, worked for others and set her own pay. That she lacked written contracts does not mean that Ponderosa failed to prove she provided contracted service to two different customers. Because the testimony of these six or seven witnesses was uncontradicted and the ALJ made no comment doubting their credibility, we must conclude that the ALJ erred in determining that Ponderosa failed to present, as he said, "persuasive evidence" that at least some of the disputed individuals provided contracted service to others. The ALJ's determination, given the unchallenged evidence, lacks substantial reason. Consequently, we must remand with instructions for the ALJ to make new findings pertaining to ORS 670.600(3)(c), and reconsider its determination concerning whether that criterion was satisfied as to the disputed individuals. On remand, the ALJ may employ the parties' prehearing stipulation that the ALJ "can take the consensus [witness testimony on this criterion] and apply it to [Karen Ellingson, Hayden Mayea, Darcy Day Ling-Scott, and Bradford Livsey]." The so-called witness consensus as to those four individuals, plus witnesses Sundstrom and Blanchette, may provide the needed third criterion for six of the remaining disputed 10 individuals. As to four individuals who did not testify and to whom the stipulation did not apply (Charles Burdick, Linda Burdick, Kimberly Clark, and Krystal Fairbanks) or as to others, the ALJ may reopen the record in his discretion in order to clarify or complete the evidence as to this criterion on the

disputed individuals. New findings and an appropriate conclusion should follow as to the 10 remaining individuals.

In sum, we hold that none of the 21 individuals was under Ponderosa's "direction and control." Ponderosa did satisfy ORS 670.600(2)(a) as to them. Because two cleaners (Dawn Thatch and Julie Allen) were stipulated to have satisfied ORS 670.600(3), they should be treated as independent contractors. The five cleaners that the the ALJ determined had "independently established businesses" (Eileen Evan, Roger Renner, Ruth Rincon, Emilee Stoery, and Marie Libel) and the inadvertently omitted cleaner (Sharon Sparrow) shall likewise be considered independent contractors. We further conclude that all of the individuals satisfied ORS 670.600(3)(b), as they did bear a risk of loss in providing their services. As a result, three more individuals have satisfied three of the five criteria in ORS 670.600(3) (Tracy Curtis, Tammy Gill, and Kym Hartford) so as to be recognized as independent contractors. Thus, the classification of 11 individuals is resolved in this opinion. Ten remain unresolved. As to those 10 individuals, the record establishes their risk of loss and ability to hire, satisfying two criteria, when any three of five potential criteria would prove an "independently established business." As to one of the other criteria, we remand to the ALJ to make new findings under ORS 670.600(3)(c) concerning whether the individuals provided contracted services to two or more owners or management agencies. Reconsideration of that criterion will resolve the classification of the remaining individuals.

Reversed and remanded for reconsideration.