Argued and submitted November 15, 2012, reversed and remanded for reconsideration of AGAT's contention that driver Kotlyarenko was the lessor of a for-hire carrier; otherwise affirmed April 17, 2013.

In the Matter of Tax Hearing for AGAT Transport, Inc.

AGAT TRANSPORT, INC.,
*Petitioner,*

*v.*

EMPLOYMENT DEPARTMENT,
*Respondent.*

Office of Administrative Hearings
T71269; A149896

305 P3d 122

Linda C. Attridge argued the cause and filed the opening brief for petitioner. With her on the reply brief was Radler, Bohy, Replogle & Conratt, LLP.

Judy C. Lucas, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Hadlock, Judge.

HADLOCK, J.

## HADLOCK, J.

Petitioner AGAT Transport, Inc. (AGAT) seeks review of a final order of an administrative law judge (ALJ) that affirmed a tax assessment issued by the Employment Department (the department). In the challenged order, the ALJ determined that certain truck drivers whom AGAT paid to transport cargo were AGAT's employees, rejecting AGAT's contention that the drivers were independent contractors. Based on that determination, the ALJ concluded that the drivers' compensation was subject to unemployment tax, which AGAT had not paid. The ALJ also rejected AGAT's argument that its payments to one driver, Kotlyarenko, were exempt from unemployment tax under ORS 657.047(1)(b) because Kotlyarenko had leased a vehicle to AGAT and was, therefore, the lessor of a for-hire carrier.[1] On review, AGAT challenges both aspects of the ALJ's order. As explained below, we affirm the ALJ's conclusion that certain drivers (other than Kotlyarenko) were employees, but reverse and remand for the ALJ to reconsider whether AGAT's compensation of Kotlyarenko was exempt on the basis that he was the lessor of a for-hire carrier.

We state the facts consistently with the ALJ's unchallenged factual findings and the uncontroverted evidence in the record.[2] At all pertinent times, AGAT was a business that arranged the transport of goods. AGAT did not provide transportation services directly but instead

---

[1] ORS 657.047(1)(b) "excludes from the definition of employment services performed by a driver * * * under lease to a motor carrier." *3P Delivery, Inc. v. Employment Dept. Tax Section*, 254 Or App 180, 182, 295 P3d 83 (2012).

[2] AGAT does not separately assign error to any of the ALJ's factual findings, but it does contend that three findings are not supported by substantial evidence. First, AGAT contends that the record does not support the ALJ's statement that "[i]t is unknown what agreement, if any," AGAT had with driver Kotlyarenko. We address that contention in our discussion of AGAT's first assignment of error. Second, AGAT challenges the finding that certain drivers could hire other drivers "only with [AGAT's] written authorization." We have disregarded that finding in our analysis, so we need not determine whether the record supports it. Finally, AGAT contends that no evidence supports what it claims to be a finding that AGAT controlled the routes that all of its drivers took, pointing to the ALJ's assertion that AGAT "had the right to determine the transportation route." We read that clause as referring only to drivers operating under a different kind of contract than the one at issue in this case, and not to the drivers whose status is the subject of AGAT's request for judicial review.

contracted with individual drivers, using two types of contracts: "Parties/Percentage Contract[s]" (PPCs) and what AGAT called "Independent Contractor Agreement[s]" (ICAs). AGAT's petition for judicial review relates to the status of those drivers who operated under the PPCs; the status of the ICA drivers is not at issue.

Under the PPCs, AGAT identified transport opportunities with various shippers of goods and offered those jobs to the PPC drivers. The drivers were free to accept or reject those jobs and could determine their own availability for work. The PPC drivers could hire other people to perform transportation services for them, but only if those people were deemed "qualified" by AGAT's safety department. In addition, the PPCs prohibited drivers from carrying passengers and required them to call AGAT's dispatch center frequently: every day when in transit; immediately after loading and unloading cargo; any time a driver was delayed or off schedule; and "when instructed to do so." Either AGAT or the PPC drivers could terminate the contracts, without cause, after giving 30 days' written notice.

The PPCs allowed drivers to provide their own vehicles for transport. In practice, however, most (perhaps all) of the PPC drivers leased trucks from AGAT under a "lease to own" agreement that was a part of the PPC; as the ALJ characterized it, "the equipment lease was only a provision within the PPC, and not a separate agreement." Under that "lease to own" provision, a driver could establish title to a truck after making payments to AGAT for a specified number of years and, while leasing the truck, could use it to enter into transportation contracts with other businesses. If the PPC was terminated, the lease would end, AGAT would retain the truck, and AGAT would refund the driver's principal investment.[3]

---

[3] While the PPC was in effect—that is, while the drivers made lease payments to AGAT—AGAT typically paid the drivers 88 to 90 percent of all "Net Gross Revenue," defined as the net amount that AGAT charged the shipper "after deductions for discounts, commissions, and other fees and charges other than operating expenses." According to the PPCs, that percentage payment was meant to compensate the drivers for "the use of the motor vehicles" as well as the services the drivers performed.

PPC drivers were required to get AGAT's permission before having repairs or maintenance work performed on the equipment they leased from AGAT. In addition, the drivers were required to carry cargo insurance and fire/theft/collision insurance. Regardless of what vehicle a PPC driver used, the driver was required to display signs and insignia that AGAT specified.

In October 2010, the Employment Department Tax Section sent a Notice of Tax Assessment to AGAT stating that the company owed unemployment insurance tax for compensation paid to drivers in 2008 and 2009, but had not paid employment taxes on that compensation. AGAT requested a hearing, and the department referred the matter to the Office of Administrative Hearings, which appointed an ALJ to resolve the dispute.

The fundamental question before the ALJ was whether the PPC drivers qualified as employees, whose compensation was subject to employment taxes, or as independent contractors, whose payment was exempt from such taxes. *See* ORS 657.040(1) ("Services performed by an individual for remuneration are deemed to be employment subject to this chapter unless and until it is shown to the satisfaction of the Director of the Employment Department that the individual is an independent contractor, as that term is defined in ORS 670.600."). For purposes of unemployment insurance, "independent contractor" means a person "who provides services for remuneration and who, in the provision of the services":

"(a)  Is free from direction and control over the means and manner of providing the services, subject only to the right of the person for whom the services are provided to specify the desired results;

"(b)  * * * [I]s customarily engaged in an independently established business;

"(c)  Is licensed under ORS chapter 671 or 701 if the person provides service for which a license is required under ORS chapter 671 or 701; and

"(d)  Is responsible for obtaining other licenses or certificates necessary to provide the services."

ORS 670.600(2). Those statutory criteria are conjunctive, so each must be met for a person to be considered an "independent contractor." *Avanti Press v. Employment Dept. Tax Section*, 248 Or App 450, 456, 274 P3d 190 (2012).

In this case, the disputed issues at hearing were whether the PPC drivers were (1) free from direction and control over the means and manner of providing services and (2) customarily engaged in independently established businesses.[4] Noting that AGAT had the burden to prove that the department's assessment was incorrect, ORS 657.683(4), the ALJ determined that AGAT had not proved either that the PPC drivers were "free from direction and control" by AGAT or that the drivers were "customarily engaged in an independently established business."

AGAT separately contended that the compensation it had paid to one driver, Kotlyarenko, was exempt from employment tax under ORS 657.047(1)(b) because Kotlyarenko had leased a vehicle to AGAT, making him the lessor of a for-hire carrier. AGAT based this second argument on evidence—which AGAT asserted it had e-mailed to the ALJ—that Kotlyarenko had signed a PPC and had leased AGAT a vehicle that he owned, pursuant to an "Equipment Lease Contract." However, the ALJ found that it was "unknown what agreement, if any," AGAT had entered into with Kotlyarenko and implicitly concluded that AGAT had not established that the department's assessment as to that driver was incorrect.

On review, AGAT raises two assignments of error. First, the company argues that the ALJ erred in upholding the department's tax assessment with respect to Kotlyarenko. In support of that argument, AGAT references a PPC and an "Equipment Lease Contract" that are included in the excerpt of record to its brief, which AGAT asserts it submitted to the ALJ by e-mail together with its written closing argument. Because those documents were before the ALJ, AGAT contends, substantial evidence does not support the ALJ's finding that it is "unknown" what agreement Kotlyarenko had

---

[4] The drivers were not required to be licensed under either ORS chapter 671 or ORS chapter 701, so the third criterion was not applicable, and the department did not dispute that the PPC drivers met the fourth criterion.

with AGAT. The department responds by asserting that the ALJ did not admit Kotlyarenko's PPC and equipment lease contract into the evidentiary record. It contends, therefore, that this court should disregard those documents. Alternatively, the department argues, we should remand the case to the ALJ for reconsideration if we conclude that Kotlyarenko's PPC and lease contract are indeed "in the judicial review record." We take the latter course.

The judicial review record that the department initially transmitted to this court did not include either Kotlyarenko's PPC or his equipment lease contract. However, the department moved to correct the record in order to include those documents, along with AGAT's closing argument, and the Appellate Commissioner granted its motion. Accordingly, those documents are part of the record on judicial review. Admittedly, it is not clear to us whether the ALJ intended to consider the attachments to AGAT's closing argument as part of the *evidentiary* record on which he could base his determination regarding Kotlyarenko's status. However, at least some of the ALJ's statements during the hearing suggested that he might consider attachments to AGAT's e-mail. Under the circumstances, we deem it appropriate to remand the order to the ALJ for reconsideration of AGAT's argument that Kotlyarenko's compensation was exempt from taxation. On reconsideration, the ALJ will have an opportunity to clarify whether Kotlyarenko's PPC and equipment lease contract are part of the evidentiary record and, if so, to determine in the first instance whether Kotlyarenko was, therefore, the lessor of a for-hire carrier whose compensation was exempt from taxation under ORS 657.047(1)(b).

In its second assignment of error, AGAT challenges the ALJ's conclusion that the PPC drivers were employees, not independent contractors. Except for one factual finding that we do not include in our analysis,[5] AGAT does not contend that the ALJ's pertinent findings of historical fact are unsupported by substantial evidence. Rather, AGAT challenges only the ALJ's ultimate ruling that the PPC drivers were not independent contractors. That ultimate

---

[5] *See* 256 Or App at 296 (discussing finding).

determination—whether a particular person is an employee or independent contractor—is a question of law. *Schaff v. Ray's Land & Sea Food Co., Inc.*, 334 Or 94, 101 n 3, 45 P3d 936 (2002) ("'[W]here there is no dispute as to what the arrangement is, the question of employee or independent contractor is one of law for the court.'" (Citation omitted.)); *see Avanti*, 248 Or App at 459 (similar). Moreover, determining whether a certain individual meets the statutory criterion of being "free from direction and control over the means and manner of providing the services, subject only to the right of the person for whom the services are provided to specify the desired results," ORS 670.600(2)(a), also involves a legal question; it is not a pure question of fact. That is the necessary implication of our decision in *Avanti*, another unemployment tax case. *See* 248 Or App at 459, 466-71 (addressing interpretation *and application* of ORS 670.600 and the administrative rules relating to the "direction and control" test as legal questions, not fact questions that are reviewed only for substantial evidence).

As explained above, a person who provides services for remuneration can be an independent contractor only if the person meets certain requirements, including being "free from direction and control over the means and manner of providing the services, subject only to the right of the person for whom the services are provided to specify the desired results" and being "customarily engaged in an independently established business." ORS 670.600(2). AGAT contends that its PPC drivers met both of those requirements. We disagree, and we affirm the ALJ's determination that the PPC drivers were employees because they were not free from AGAT's control over the means and manner by which they provided services.[6]

The statutory "direction and control" test addresses two aspects of a person's work: the means and the manner by which the person provides services. ORS 670.600(2)(a). An administrative rule defines "means" as "resources used or

---

[6] Because we agree with the ALJ's determination that the PPC drivers were not free from AGAT's direction and control, we need not address the ALJ's additional determination that those drivers were not customarily engaged in independently established businesses.

needed in performing services." OAR 471-031-0181(3)(a)(A). To be free from direction and control over the means of providing services, a person "must determine which resources to use in order to perform the work, and how to use those resources." *Id*. The rule also defines "manner," stating that the word means "the method by which services are performed." OAR 471-031-0181(3)(a)(B). To be free from direction and control over the manner of providing services, a person "must determine how to perform the work." *Id*.

In this case, AGAT asserts that the PPC drivers were free from AGAT's direction and control over the means of transporting goods because the evidence indicates that they could choose to provide a truck, rather than leasing one from AGAT; if they did lease trucks from AGAT, they were responsible for those vehicles; they could drive the trucks for other carriers; they purchased their own insurance; and they provided other equipment they deemed necessary, like computers or GPS devices. AGAT also argues that the PPC drivers were free from direction and control over the manner of transport because, for example, they established their own schedules, had the option of accepting or rejecting jobs, could carry other carriers' cargo, and could hire other people to help perform the work.

The department responds that the ALJ's determination that AGAT controlled the means of the PPC drivers' work is supported by evidence that "AGAT had the right to—and did—control the vehicles used by the PPC drivers, because it owned them, approved who could operate them, and had the right to limit how the driver could use them." With respect to the manner of work, the department focuses on AGAT's requirements that PPC drivers display signs and insignia specified by AGAT, that the drivers adhere to terms regarding pickup and delivery specified in the contracts between AGAT and its customers, and that drivers call AGAT's dispatch center at various specified times, as well as whenever they were "instructed to do so." The department also points to AGAT's right to terminate the PPC agreements if the drivers carried passengers, drove while under the influence of various substances, failed to correct "noncompliance" by the driver's own employees, or failed to

inform AGAT of citations, violations, or damage to AGAT's equipment or cargo.

We conclude that the department has the better argument, although we do not agree with all aspects of its analysis. In considering whether a purported employee is "free from direction and control over the means and manner of providing the services, subject only to the right of the person for whom the services are provided to specify the desired results," ORS 670.600(2)(a), one must bear in mind that a person who is compensated for performing services virtually always will be subject to *some* level of oversight by the entity or individual for whom the work is performed. *See Avanti*, 248 Or App at 461 ("[T]he right to control test * * * has never required that an 'independent contractor' be free from *all* direction and control." (Emphasis in original.)). The critical question is whether that oversight relates primarily to "specify[ing] the *desired results*" of the work, ORS 670.600(2)(a) (emphasis added), or, instead, to having authority to control the way in which the work is performed ("the means and manner of providing the services"). In making the distinction between those two types of control, it is important to focus on the type of service performed, and consider whether it is *that* service—not the end result— over which the individual providing services is free from direction and control.

Thus, in *Avanti*, we considered the significance of evidence that a company provided a sales representative with "order forms, price lists, catalogs, and other promotional materials" that she could use in selling the company's products. 248 Or App at 470. The ALJ had ruled that the company's provision of those materials indicated the company's control over the sales representative's means of performance. *Id*. at 470-71. We disagreed. Under the circumstances involved in that case, we held, "the use of that type of promotional material [was] more aptly considered part of [the company's] right to specify the 'desired results'—that is, those materials pertain more to *what* [the sales representative] solicits than to *how* she solicits." *Id*. at 471.

Here, too, some of the factors the department relies on relate primarily to AGAT's right to specify the desired

results of the PPC drivers' work, and not to the way in which the drivers perform that work. In particular, AGAT's requirement that its drivers meet the expectations of AGAT's customers regarding pickup and delivery relates primarily to the "desired results"; it does not indicate control over the means or manner by which drivers could achieve that goal.

Considering the totality of the circumstances, however, we conclude that the PPC drivers were not free from AGAT's direction and control over the means and manner in which they performed their services. In that regard, AGAT's ownership and control over the trucks that the PPC drivers operated is significant.[7] We start from the premise that, if the trucks belonged to AGAT and the drivers had no interest in the equipment, the drivers probably would be employees, as they could not be said to be free from AGAT's control over the "resources used or needed in performing services." OAR 471-031-0181(3)(a)(A). Here, of course, the PPC drivers leased trucks from AGAT pursuant to lease-to-own arrangements. However, as the ALJ found, "the equipment lease was only a provision within the PPC, * * * not a separate agreement[,]" and the lease would end upon termination of the PPC—an event that AGAT could cause to occur without cause, upon 30 days' notice. The record includes no evidence that a person could enter a similar lease agreement with AGAT without also contracting to be a driver; nor does the record suggest that a driver whose PPC contract was terminated could choose to continue leasing his or her truck, making payments under the lease-to-own agreement. In short, the truck leases were coextensive with the PPC driving contracts and had no independent existence. Thus, as a practical matter, AGAT supplied the PPC drivers with the primary piece of equipment they needed to be able to provide driving services to the company. The expediency of a lease agreement that is inextricably intertwined with the driving contract cannot change what otherwise would be an employment relationship into an independent contracting agreement.

---

[7] Kotlyarenko may be an exception if he did, in fact, own his own truck and lease it to AGAT. The ALJ will have an opportunity to address Kotlyarenko's status on remand.

Our conclusion that the PPC drivers were not independent contractors is not based solely on the lease agreement, however, but also on other indicia that AGAT exerted control over how the drivers did their work. AGAT prohibited the PPC drivers from carrying passengers, it required the drivers to contact dispatch at various times that did not necessarily relate to the desired result associated with any given shipping job, and it allowed PPC drivers to hire other drivers to help with transportation services only if AGAT first determined that those drivers were qualified.[8] In short, the ALJ's factual findings lead to the conclusion that AGAT controlled not only the trucks that the PPC drivers used, but also the manner in which those individuals performed their driving services. Accordingly, with the exception of Kotlyarenko, the ALJ did not err in concluding that the PPC drivers were not independent contractors.

Reversed and remanded for reconsideration of AGAT's contention that driver Kotlyarenko was the lessor of a for-hire carrier; otherwise affirmed.

---

[8] On the last point, AGAT's president testified that, to be qualified, a driver only had to have a commercial driver's license and pass a drug test. Even if we agreed with AGAT's implicit contention that it would not exercise "control" merely by requiring that any additional drivers meet legal requirements for providing driving services (a point that we do not address), AGAT did more than that in this case. It did not simply specify that any additional drivers meet certain legal requirements. Instead, it mandated that the PPC drivers (1) have *AGAT* confirm that any additional drivers met licensing requirements, (2) have additional drivers take a drug test *as specified by AGAT*, and (3) wait for AGAT to approve them for driving. That is the essence of "direction and control."