CEVA FREIGHT, LLC,
*Petitioner,*

*v.*

EMPLOYMENT DEPARTMENT,
*Respondent.*

Office of Administrative Hearings
T71575; A157773

379 P3d 776

Braden K. Core argued the cause for petitioner. With him on the briefs were Steven A. Pletcher, Brandon K. Wiseman, and Scopelitis, Garvin, Light, Hanson & Feary, P.C., Indiana, and Jennifer N. Warberg and Littler Mendelson, P.C.

Judy C. Lucas, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

James D. Nelson and Betts, Patterson & Mines, P.S., Washington, filed the brief *amicus curiae* for American Trucking Association, Inc., and Truck Renting and Leasing Association.

Seann C. Colgan, Emily Harris, and Corr Cronin Michelson Baumgardner Fogg & Moore, LLP, Washington, filed the brief *amicus curiae* for Oregon Trucking Association.

Before Ortega, Presiding Judge, and Lagesen, Judge, and Garrett, Judge.

## GARRETT, J.

CEVA Freight, LLC, a for-hire carrier licensed to transport commodities in interstate commerce, petitions for judicial review of an order of an administrative law judge (ALJ) for the Office of Administrative Hearings upholding the Employment Department's assessments of unemployment compensation taxes on remuneration that CEVA paid to "owner operator" truck drivers for the audit period from the first quarter of 2009 through the second quarter of 2011. The ALJ upheld the assessments after determining that the services of the owner-operators constituted "employment" that was not exempt as services of independent contractors under ORS 657.040, ORS 670.600(2), or under ORS 657.047.

We review the ALJ's order for substantial evidence and errors of law, ORS 183.482(8)(a); ORS 657.684 (providing for judicial review as in review of orders in contested cases in ORS chapter 183). As explained below, we reverse the assessments based on our conclusion that CEVA established that the owner-operators were independent contractors and that their services were therefore excluded from employment, ORS 657.040; ORS 670.600(2). We therefore do not reach the question whether CEVA, a for-hire motor carrier licensed and authorized to transport commodities in interstate commerce, also established that the transportation services it provided through the use of leased vehicles and owner-operators were exempt from employment under ORS 657.047.

We draw our summary of the relevant facts from the ALJ's findings, which are not challenged on judicial review. CEVA is a "full-service logistics provider," licensed and authorized by the United States Department of Transportation (USDOT) to operate as an interstate motor carrier.[1] At the relevant time, CEVA's services included freight forwarding, order fulfillment, warehousing, and air and ground transportation of goods. To carry out its transportation services, CEVA worked with different types of drivers: (1) its own employees; (2) drivers who worked for carrier agents who operated under their own motor

---

[1] Under federal law, to ship freight in interstate commerce, a motor carrier must be licensed by and register with the USDOT, 49 USC §§ 13901, 13902, and must comply with regulations promulgated by the USDOT, 49 USC § 13902(a)(1).

carrier authority; (3) owner-operators who provided trucks and drivers to CEVA and performed their services under CEVA's operating authority; and (4) drivers who worked for owner-operators.

The dispute in this case concerns only those services provided by owner-operators and the drivers who worked for them. CEVA's standard form agreement with its owner-operators during the relevant time period, entitled "Agreement for Leased Equipment and Independent Contractor Services (Pick-up & Delivery)," is central to our resolution. The agreement stated that the owner-operator leased the vehicle to CEVA for the purpose of

> "rendering certain pick-up and delivery services to facilitate the transportation of shipments of goods around-the-clock seven days-a week, 365 days-a-year to and from [CEVA] customers within the time-sensitive service parameters required by [CEVA's] customers."

The agreement provided that the owner-operator was either self-employed "for all purposes," or "the authorized representative of a business entity" unrelated to CEVA. It provided that the owner-operator was not to be considered an employee of CEVA for any purpose.

As an interstate motor carrier, CEVA's operations are subject to an extensive body of federal law. CEVA's agreement with its owner-operators included the following paragraph entitled "Compliance with FHWA [Federal Highway Administration] Regulations":

> "To the extent required by the Federal Motor Carrier Safety Regulations * * * Contractor agrees to relinquish to CEVA exclusive possession, control and use of the Leased Vehicle while it is in service to CEVA and its customers under this Agreement and CEVA agrees to assume responsibility for same."[2]

---

[2] In seeming juxtaposition, a paragraph in the agreement entitled "Operation of Leased Vehicle" provided:

"With consideration to the safety and security of the Leased Vehicle, cargo, driver, and the general public, Contractor agrees to direct the operation of the Leased Vehicle and to determine the method, manner and means of performing the contractual obligations under this Agreement in all respects * * *[.] *Nothing contained in this Agreement shall be construed, however, as vesting in CEVA any control over or right to control the Leased Vehicle or any of the Contractor's drivers.*"

(Emphasis added.)

Owner-operators either owned or leased their vehicles. To operate their vehicles, owner-operators incurred significant expenses that were not reimbursed by CEVA, including expenses for business licenses, insurance, fuel, tires, operations, repairs, maintenance, tools, uniforms, and cleaning materials. CEVA advanced payment for owner-operators' state registration and permit fees, but deducted those expenses from its payments to owner-operators.

All of CEVA's drivers completed an application that included driver license information, safety history, drug and alcohol history, and previous employment. CEVA performed annual checks of driving records and had a "zero tolerance" policy for drug and alcohol offenses by drivers. Owner-operators could hire and fire nondriver helpers without CEVA's permission, but the hiring of drivers was subject to CEVA's written approval. CEVA's agreement prohibited owner-operators and their drivers from carrying passengers who were not helpers without CEVA's written approval when the vehicle was laden with cargo for CEVA. Owner-operators who hired their own drivers or helpers also paid employment taxes.

The agreement required drivers to attend periodic safety meetings sponsored by CEVA or the Transportation Safety Administration (TSA). Although the agreement required that new drivers attend an orientation and information session regarding CEVA's business, policies, operational procedures, service offerings, and pick-up and delivery and driving techniques, the ALJ found that in reality, CEVA did not have an orientation program for new owner-operators or their drivers; rather, it held one-on-one meetings with new owner-operators to explain CEVA's procedures and requirements, and encouraged new drivers to ride with experienced owner-operators.

Owner-operators could accept or reject dispatches offered by CEVA, choose their days and times to work, determine routes and parking sites, and perform repairs. CEVA expected owner-operators to notify them if they would be unavailable and, once a route was accepted, an owner-operator was required to make deliveries within

an anticipated time frame. The agreement prohibited an owner-operator from soliciting or performing services for compensation for any customer for whom the owner-operator had performed services during the agreement's term. But, with notification to CEVA, owner-operators could use vehicles leased to CEVA for other carriers, as long as all of CEVA's identifications and permit markings were concealed.

CEVA required that all vehicles be white, without visible body damage, and not older than five to seven years. Owner-operators were required to maintain and submit driving logs, conduct daily inspections of their vehicles, and provide inspection reports to CEVA. Vehicles were required to have an "activation" notice from CEVA.

Owner-operators paid half the cost for large decals with CEVA's logo and name, which were applied by body shops. Owner-operators were required to purchase and wear uniforms with CEVA's name and carry a CEVA photo identification. But the ALJ found that drivers who did not wish to wear a uniform could still make deliveries.

CEVA sorted freight at its loading dock at the Portland airport and arranged the freight for owner-operators to pick up. Owner-operators notified CEVA's dispatcher when they arrived at CEVA's facilities, and the dispatcher then gave each contractor a route of deliveries. CEVA assigned loads based on the size of the vehicle, the weight of the load, and the time of the driver's arrival at CEVA's facility.

Owner-operators were required to obtain customers' signatures as proof of delivery in order to be paid. Certain customers had specific requirements with which owner-operators were expected to comply; if a customer complained about a delivery to CEVA, CEVA would contact the owner-operator, who was expected to correct the cause of the complaint and cover any associated costs.

CEVA communicated with owner-operators and drivers by cell phone, which the owner-operator either provided or rented from CEVA. Owner-operators paid CEVA a monthly "messaging fee" and were required to download to

their cell phones a software application that tracked delivery information entered by the contractor. Owner-operators were required to contact CEVA immediately if a delivery could not be made, and CEVA would contact another driver to complete the delivery.

Owner-operators were compensated based on a percentage of the tariff for each shipment, less deductible expenses. The compensation rate was generally 65 percent and bore no relationship to the size or type of vehicle, or whether it was owned or leased by the owner-operator. An owner-operator's compensation and deductions were listed in a "settlement statement" for each vehicle, which CEVA provided to the owner-operator at least bi-weekly. Owner-operators could decide how to allocate compensation between use of the vehicle and the driver's services.

Owner-operators were liable for property damage or damage to freight in their possession and bore the risk of loss for any customer service claims. The agreement required owner-operators to carry $1 million in liability insurance, with no deductible, and $1 million per vehicle in cargo loss and damage insurance, with no more than a $1,000 deductible, or a $2,000 deductible if the insurance was purchased through CEVA. The agreement required that CEVA be named as an insured on the owner-operator's insurance policy. If the owner-operator obtained policies through CEVA's insurer, CEVA would deduct the premium from the owner-operator's settlement payment.

The agreement's term was for one year, which automatically renewed unless either party gave written notice of termination. The agreement could be terminated at any time by mutual agreement, with notice of breach, or with 30-days written notice. It could be terminated immediately if the vehicle was permanently unavailable or if the owner-operator violated the rights of CEVA's personnel or a third party, participated in any dishonest or bad act, or disclosed the agreement's terms.

With those facts in mind, we turn to the legal framework. Under Oregon's unemployment compensation law, services performed for remuneration are deemed to be employment, "unless and until it is shown to the satisfaction of the

Director of the Employment Department that the individual is an independent contractor, as that term is defined in ORS 670.600." ORS 657.040(1). As relevant here, ORS 670.600(2) defines an independent contractor as one who, in the provision of services:

"(a) Is free from direction and control over the means and manner of providing the services, subject only to the right of the person for whom the services are provided to specify the desired results;

"(b) Except as provided in subsection (4) of this section, is customarily engaged. in an independently established business;

"* * * * *

"(d) Is responsible for obtaining other licenses or certificates necessary to provide the services."

The statute's requirements are conjunctive, meaning that all three criteria must be satisfied. *Broadway Cab LLC v. Employment Dept.*, 358 Or 431, 443, 364 P3d 338 (2015); *Avanti Press v. Employment Dept. Tax Section*, 248 Or App 450, 456, 274 P3d 190 (2012).

As noted, the ALJ determined that the owner-operators were not independent contractors and upheld the department's assessments. CEVA, as the party challenging the assessments, bears the burden of proving that the ALJ erred. ORS 657.683(4). The ultimate question of whether CEVA's owner-operators were independent contractors is a question of law. *Schaff v. Ray's Land & Sea Food Co., Inc.*, 334 Or 94, 101 n 3, 45 P3d 936 (2002); *AGAT Transport, Inc. v. Employment Dept.*, 256 Or App 294, 305 P3d 122 (2013). As explained below, we conclude that CEVA met its burden, because the record requires the conclusion that the owner-operators met all of the criteria for deeming them independent contractors.

Under ORS 670.600(2)(d), an independent contractor must be "responsible for obtaining * * * licenses or certificates necessary to provide the services." In concluding that the owner-operators did not satisfy that requirement, the ALJ focused on CEVA's interstate motor carrier authority and explained that CEVA's operating authority was a

requirement for the transport of goods in interstate commerce. Owner-operators who did not have their own motor carrier authority were operating under CEVA's license with USDOT. Thus, the ALJ reasoned, CEVA's operating authority was a prerequisite to the work of the owner-operators. Because owner-operators who worked for CEVA were not responsible for obtaining their own operating authority, the ALJ reasoned, they did not satisfy the requirement of ORS 670.600(2)(d). CEVA contends on judicial review that the ALJ erred in that analysis, and we agree.

The ALJ's rationale is not borne out by the agreement, which describes the parties' relationship and the owner-operators' services. In *AGAT Transport, Inc.*, we explained that, in evaluating whether a relationship is one of employment because of the exercise of "direction and control," ORS 670.600(2)(a), the focus is on the type of service performed, and not on the end result. 256 Or App at 303. Similarly, in determining who is responsible for obtaining licenses or certificates "necessary to provide the services" under ORS 670.600(2)(d), the focus must be on the services provided by the person who is paid the remuneration. Contrary to the ALJ's reasoning, the owner-operators were not performing interstate transport *for the public* for which they were required to have interstate operating authority. The agreement between CEVA and its owner-operators described the services provided to CEVA as "rendering certain pick-up and delivery services to facilitate the transportation of shipments of goods * * * to and from [CEVA] customers within the time-sensitive service parameters required by [CEVA's] customers." Unlike CEVA, which was an interstate motor carrier licensed by USDOT to provide transportation services to the public, and for which licensing authority was required, the owner-operators provided pick-up and delivery services *to CEVA*. As required by their agreements, the owner-operators were responsible for obtaining state driver licenses necessary to carry out those delivery services. But they were not interstate motor carriers. We are aware of no basis for concluding that owner-operators were required to obtain any federal license in order to perform delivery services for CEVA. We conclude, therefore, that the record requires the conclusion that the owner-operators satisfied

the requirement of ORS 670.600(2)(d), because they were responsible for obtaining all of the licenses—namely, state driver licenses—necessary to accomplish their pick-up and delivery services.

Under ORS 670.600(2)(a), an independent contractor must be "free from direction and control over the means and manner of providing the services, subject only to the right of the person for whom the services are provided to specify the desired results." The determination whether a person meets the statutory criteria of being free from direction and control, though involving factual issues, is ultimately a question of law. *Avanti*, 248 Or App at 466-71 (applying standard).

CEVA challenges the ALJ's determination that, although the owner-operators provided the trucks and drivers for the deliveries, CEVA had the right to exercise direction and control over the "means and manner" of providing the services.

The "means" of providing services is defined by administrative rule as

> "the resources used or needed in performing services. To be free from direction and control over the means of providing services an independent contractor must determine which resources to use in order to perform the work, and how to use those resources."

OAR 471-031-0181(3)(a)(A). In determining that CEVA exercised control over the means of providing services, the ALJ once again focused on CEVA's interstate motor carrier authority, explaining that it was "the most crucial resource CEVA provided to the owner operators." For the reasons explained above with respect to licensing, we conclude that CEVA's motor carrier authority was not a resource required for the owner-operators to perform *their* delivery services to CEVA and should not be treated as a "means" of providing services within the meaning of ORS 670.600(2).

The ALJ cited other factors to support the conclusion that CEVA exercised control over the means of providing services: CEVA's provision of some tools, accounting and delivery tracking software, and facilities for and

arrangement and assignment of loads. We agree with the ALJ that some of those resources are like the examples of "means" provided in OAR 471-031-0181(3)(a)(A) (means include "tools or equipment, labor, devices, plans, materials, licenses, property, work location, and assets"). Others items, such as CEVA's accounting and tracking systems, facilities and methods for assigning loads, while integral to CEVA's own business, do not show control over the means by which the owner-operators provided delivery services to CEVA.

The ALJ also cited requirements imposed by CEVA relating to the color, age, and condition of trucks, branding, uniforms, services for specific customers, photo identification, periodic inspections, background checks, and drug and alcohol testing. Many of those requirements, such as vehicle identification, background checks, inspections, drug and alcohol testing, are imposed on CEVA (and, indirectly, on any drivers with whom it contracts) by law, as they are on any motor carrier. CEVA is required to comply with the law and to enforce those requirements on its drivers in order to maintain its motor carrier license. And, whether or not the owner-operators were performing delivery services for CEVA, for another motor carrier, or for themselves, they would be subject to those particular requirements. For that reason, they do not suggest a conclusion one way or the other concerning CEVA's relationship with its owner-operators or whether they were employees or independent contractors. *Cf. Brown v. Pettinari,* 165 Or App 279, 284-85, 994 P2d 1231 (2000) (provision in vehicle lease agreement in compliance with federal requirement that the lessee have exclusive possession, control, and use of vehicle was not legally dispositive regarding the employment relationship; rather it was just one factor to be considered in determining the nature of the relationship).

Requirements relating to the condition or appearance of the truck are incidental to the services provided by the owner-operators but, when considered in context, they do not weigh heavily in the balance. We agree with CEVA that, although CEVA provided resources to owner-operators that facilitated CEVA's business as a for-hire motor carrier, and imposed requirements on owner-operators incidental to those functions and necessary for compensation of the

owner-operators, the owner-operators provided the fundamental means of carrying out the services: their vehicles, drivers and other labor, maintenance, liability and workers' compensation insurance, and fuel.

OAR 471-031-0181(3)(a)(B) defines the "manner" of providing services as "the method by which services are performed," *i.e.*, "how to perform the work." The ALJ focused on a number of factors that, he concluded, reflected control by CEVA over the "manner" of providing the services. We agree with the ALJ that some factors do suggest a degree of control by CEVA over the method by which owner-operators performed the work of picking up and delivering goods. For example, drivers were required to comply with CEVA's safety policies and to receive training on the use of CEVA's systems. Owner-operators were required to submit driving logs and accident, inspection, and maintenance reports. CEVA assigned deliveries to owner-operators and provided a window for delivery times.

But, apart from those requirements, CEVA played little role in how owner-operators performed their work. Owner-operators provided and operated their own trucks and could hire their own drivers, establish their own work schedules, routes, and delivery schedules, and load their vehicles according to their preferences. As we said in *AGAT Transport, Inc.*, the direction-and-control test does not require that an independent contractor be free of *all* direction and control. In making the determination whether a person is subject to direction and control, "one must bear in mind that a person who is compensated for performing services virtually always will be subject to *some* level of oversight by the entity or individual for whom the work is performed." 256 Or App at 303 (emphasis in original); *Avanti*, 248 Or App at 461 (the right to control "is a matter of degree") (quoting *Pam's Carpet Service v. Employment Div.*, 46 Or App 675, 681, 613 P2d 52 (1980)). "[T]he question is whether the party contracting for services maintains control over the 'means and manner' of performance or, instead, gives more generalized instructions concomitant to the 'right of the person for whom the services are provided to specify the *desired result*[.]" *Avanti*, 248 Or App at 461 (emphasis in original). Here, the facts found by the ALJ as well as the undisputed

facts in the record require the conclusion that the owner-operators controlled the method by which they performed the delivery services required by their agreements with CEVA, and that CEVA's requirements were directed toward the desired result of those services. *See AGAT Transport, Inc.*, 256 Or App at 304.

We turn to the third of the three conjunctive requirements for establishing independent-contractor status. Under ORS 670.600(2)(b), an independent contractor must be "customarily engaged in an independently established business." A person is considered to be engaged in an independently established business if three of the five criteria listed in ORS 670.600(3) are met:

> "(a)   The person maintains a business location.
>
> "* * * * *
>
> "(b)   The person bears the risk of loss related to the business or the provision of services * * *[.]
>
> "(c)   The person provides contracted services for two or more different persons within a 12-month period, or the person routinely engages in business advertising, solicitation or other marketing efforts reasonably calculated to obtain new contracts to provide similar services.
>
> "(d)   The person makes a significant investment in the business * * *[.]
>
> "* * * * *
>
> "(e)   The person has the authority to hire other persons to provide or to assist in providing the services and has the authority to fire those persons."

The ALJ concluded that CEVA had not met its burden to show that the owner-operators met three of the five criteria. We have reviewed the record and conclude that CEVA did meet that burden. As the ALJ found, CEVA used a standard contract with each owner-operator. Under the unambiguous terms of those contracts, the owner-operators (1) bore the risk of loss related to their business through their responsibility for loss of their vehicles due to accident or break-down and responsibility for loss to CEVA's customers, ORS 670.600(3)(b); (2) made significant investments in their

business through the ownership or lease of their vehicles and payment of all operating expenses, ORS 670.600(3)(d); and (3) had the authority to hire or fire helpers to provide or to assist in providing the services. ORS 670.600(3)(e). The ALJ therefore erred in concluding that CEVA did not establish that the owner-operators were engaged in an "independently established business," within the meaning of ORS 670.600(2)(b) and ORS 670.600(3).

In sum, because CEVA's owner-operators met each of three criteria necessary to be treated as independent contractors under ORS 670.600(2), their services were exempt from employment under ORS 657.040. In light of our conclusion, we do not reach CEVA's additional contention that the transportation services performed by the owner-operators were exempt from employment under ORS 657.047.

Reversed and remanded.