Submitted November 4, 2015, affirmed December 29, 2016

SWIFT COURIERS, INC.,
*Petitioner,*

*v.*

EMPLOYMENT DEPARTMENT,
*Respondent.*

Office of Administrative Hearings
2014UIT00063; A157284

387 P3d 434

Dan Webb Howard and Gleaves Swearingen, LLP, filed the briefs for petitioner.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Karla H. Ferrall, Assistant Attorney General, filed the briefs for respondent.

Before Lagesen, Presiding Judge, and Garrett, Judge, and Schuman, Senior Judge.

## LAGESEN, P. J.

Swift Couriers, Inc., (Swift) petitions for review of the final order of an administrative law judge (ALJ) that affirmed employment tax assessments by respondent Employment Department (the department). In that order, the ALJ concluded that Swift failed to show that Laycock, who worked in Swift's distribution center and provided delivery services for Swift, was an independent contractor, as Swift claimed. Specifically, the ALJ determined that, although Swift showed that Laycock was free from Swift's direction and control within the meaning of ORS 670.600(2)(a), Swift failed to demonstrate that Laycock was "customarily engaged in an independently established business," ORS 670.600(2)(b). Accordingly, the ALJ concluded that Laycock was presumed to be Swift's employee under ORS 657.040, and was not an independent contractor. Before us, Swift challenges the "customarily engaged in an independently established business" determination. The department, in a cross-assignment of error, challenges the "free from direction and control" determination. On review for legal error,[1] we agree with the department's argument in the cross-assignment and, for that reason, affirm.

### I. BACKGROUND

A. *Facts*

We state the facts consistently with the ALJ's unchallenged factual findings and the uncontroverted evidence in the record. *AGAT Transport, Inc. v. Employment Dept.*, 256 Or App 294, 296, 305 P3d 122 (2013); *McDowell v. Employment Dept.*, 348 Or 605, 608, 236 P3d 722 (2010) (the agency's unchallenged factual findings are the facts for purposes of judicial review).

Swift is a courier and a broker of courier services. Swift delivers, and brokers the delivery of, different types of packages; the most substantial share of its business involves delivering and brokering the delivery of pharmaceuticals

---

[1] Although we defer to the ALJ's factual findings where, as here, the parties do not challenge those findings, the "ultimate determination—whether a particular person is an employee or independent contractor—is a question of law." *AGAT Transport, Inc. v. Employment Dept.*, 256 Or App 294, 301, 305 P3d 122 (2013).

for pharmacies, hospitals, clinics, and other healthcare providers.

In March 2010, Laycock entered into an agreement with Swift to provide transportation and delivery services. Under that agreement and in practice, Laycock was required to make deliveries to specified locations within particular windows of time. Laycock was required to do so using her own vehicle, which she maintained and insured at her own expense. Laycock had the discretion to choose the route she took as long as she made timely deliveries, although Laycock learned the route that she follows from Swift's general manager. Laycock had the discretion to accept or reject additional deliveries that Swift offered to her outside of her normal delivery route. She also would have been permitted to provide delivery services to others, although she never, in fact, performed deliveries for anyone but Swift. Laycock paid all taxes and insurance in connection with her work for Swift. Laycock wore a shirt with Swift's business logo. Although Swift would have permitted her to wear a shirt with her own business logo, she chose not to do so. After making a delivery, Laycock would generate an invoice to Swift. She did so using forms provided by Swift, but could have used her own forms if she wanted. Laycock had to scan some of the deliveries she made using a scanner that she leased from Swift. Because of the demands of Swift's pharmaceutical customers, Laycock had to undergo a background check and drug screens, and carry an identification badge identifying her as one of Swift's drivers. Swift would have permitted Laycock to use substitute drivers, but, because of the requirements of Swift's pharmaceutical customers, Swift would have required any potential substitute to undergo a background check and drug screens.

In practice, Laycock's services to Swift went beyond those identified in her written agreement with Swift. Although the written agreement did not specify that Laycock would be required to work in Swift's distribution center, Swift, in fact, required her to do so. Swift required Laycock to report to the distribution center each weekday morning at 5:00 a.m., and required her to call if she would be late. There, Laycock had to wait for a delivery truck to arrive from Portland and then work with other delivery drivers to

unload pallets of pharmaceutical totes from the truck, sort the pharmaceutical totes, and then load waiting delivery vans, scanning packages as they were placed onto vans. The work at the distribution center took about 1.5 to 2 hours daily. In addition to unloading, sorting, and loading, Laycock was in charge of the pharmaceutical cage where controlled substances would go. Swift owned the pallet jacks, box cutters, and other tools used for the work at the distribution center, and supplied Laycock with keys and codes in connection with that work. Swift prohibited Laycock and others from wearing open-toed shoes because they were working with pallet jacks and other heavy items. Also, according to Swift's general manager, the delivery drivers who operated out of Swift's Salem distribution center "manage[d] the place," and had a system in place for allocating responsibility for chores, such as sweeping, among themselves. If Laycock had not shown up to do that work, then she would not have been able to complete her delivery route on time.

B.  *Procedure*

In December 2013, the department issued two notices of assessment of unemployment insurance taxes to Swift. The notices indicated that Swift owed $611.15 in unemployment insurance taxes on remuneration paid to Laycock in the first quarter of 2012, and $2,213.39 in unemployment insurance taxes on remuneration paid to Laycock during the second and third quarters of 2012, and the first and second quarters of 2013. Swift requested a hearing to challenge the assessments.

At the hearing, Swift sought to prove that Laycock was an independent contractor, as that term is defined in ORS 670.600. That statute defines an independent contractor as someone who is both "free from direction and control over the means and manner of providing the services, subject only to the right of the person for whom the services are provided to specify the desired results," ORS 670.600(2)(a), and who "is customarily engaged in an independently established business," ORS 670.600(2)(b). Under ORS 670.600(3), a person is "customarily engaged in an independently established business" if at least three of five specified statutory criteria are met:

"For the purposes of subsection (2)(b) of this section, a person is considered to be customarily engaged in an independently established business if any three of the following requirements are met:

"(a)   The person maintains a business location:

"(A)   That is separate from the business or work location of the person for whom the services are provided; or

"(B)   That is in a portion of the person's residence and that portion is used primarily for the business.

"(b)   The person bears the risk of loss related to the business or the provision of services as shown by factors such as:

"(A)   The person enters into fixed-price contracts;

"(B)   The person is required to correct defective work;

"(C)   The person warrants the services provided; or

"(D)   The person negotiates indemnification agreements or purchases liability insurance, performance bonds or errors and omissions insurance.

"(c)   The person provides contracted services for two or more different persons within a 12-month period, or the person routinely engages in business advertising, solicitation or other marketing efforts reasonably calculated to obtain new contracts to provide similar services.

"(d)   The person makes a significant investment in the business, through means such as:

"(A)   Purchasing tools or equipment necessary to provide the services;

"(B)   Paying for the premises or facilities where the services are provided; or

"(C)   Paying for licenses, certificates or specialized training required to provide the services.

"(e)   The person has the authority to hire other persons to provide or to assist in providing the services and has the authority to fire those persons."

The ALJ concluded that Swift failed to demonstrate that Laycock was an independent contractor. Although he

concluded that Swift had demonstrated that Laycock was free from Swift's direction and control, he concluded that Swift had demonstrated only two of the criteria pertinent to whether Laycock was customarily engaged in an independently established business. In so doing, the ALJ rejected Swift's argument that Laycock had the authority to hire other persons to assist her with her job under ORS 670.600(3)(e), reasoning that Swift's retention of the right to require background checks and drug screens of potential substitute drivers meant that Laycock did not have such authority. Based on those determinations, the ALJ upheld the tax assessments. Swift petitioned for review.

## II.  ANALYSIS

On review, Swift contends that the ALJ erred in concluding that Swift failed to demonstrate that Laycock was customarily engaged in an independently established business. In particular, Swift contends that under *Portland Columbia Symphony v. Employment Dept.*, 258 Or App 411, 428, 310 P3d 1139 (2013), the ALJ erred in concluding that Swift's retention of the right to require background checks and drug screens for substitute drivers meant that Laycock lacked the authority to hire substitute drivers for purposes of ORS 670.600(3)(e).

In response, the department argues that the ALJ was correct to conclude that Laycock did not have the authority to hire others to perform the services that she performed for Swift. In addition, the department cross-assigns error to the ALJ's determination that Laycock was free from Swift's direction and control within the meaning of ORS 670.600(2)(a). Pointing to the facts found by the ALJ about Laycock's work at the distribution center, which show that Swift, at a minimum, exercised control over the services that Laycock provided there, the department argues that the ALJ legally erred in concluding that Laycock was "free from direction and control over the means and manner of providing services, subject only to the right of the person for whom the services are provided to specify the desired results."

For the reasons that follow, we agree with the department's argument on the cross-assignment of error. We

therefore affirm for that reason, without addressing Swift's argument as to Laycock's authority to hire and fire.

At the outset, we emphasize, as we have before, that Swift bore the burden of proving that Laycock was an independent contractor. ORS 657.040(1) ("Services performed by an individual for remuneration are deemed to be employment subject to this chapter unless and until it is shown to the satisfaction of the Director of the Employment Department that the individual is an independent contractor."); *Chelius v. Employment Dept.*, 258 Or App 72, 76-77, 308 P3d 390 (2013); *Avanti Press v. Employment Dept. Tax Section*, 248 Or App 450, 455 n 2, 456, 274 P3d 190 (2012). That means that Swift had to prove facts showing both (1) the scope of the services Laycock provided to it; and (2) that, in providing those services, Laycock was "free from direction and control over the means[2] and manner[3] of providing the services, subject only to the right of the person for whom the services are provided to specify the desired results." ORS 670.600(2)(a); *Fireside, Inc., v. Employment Dept.*, 65 Or App 455, 457, 671 P2d 734 (1983) (employer failed to meet its burden to demonstrate that musicians were independent contractors where employer failed to adequately develop the evidence "concerning the nature of their activities"). "[T]he question is whether the party contracting for services maintains control over the 'means and manner' of performance or, instead, gives more generalized instructions concomitant to the 'right of the person for whom the services are provided to specify the *desired results*[.]'" *Avanti*,

---

[2] "Means" are defined under OAR 471-031-0181(3)(a)(A) as the

"resources used or needed in performing services. To be free from direction and control over the means of providing services an independent contractor must determine which resources to use in order to perform the work, and how to use those resources. Depending upon the nature of the business, examples of the 'means' used in performing services include such things as tools or equipment, labor, devices, plans, materials, licenses, property, work location, and assets, among other things."

[3] "Manner" is defined under OAR 471-031-0181(3)(a)(B) as

"the method by which services are performed. To be free from direction and control over the manner of providing services an independent contractor must determine how to perform the work. Depending upon the nature of the business, examples of the 'manner' by which services are performed include such things as work schedules, and work processes and procedures, among other things."

248 Or App at 461 (quoting ORS 670.600(2)(a)) (emphasis in original). Whether the facts found by the ALJ are sufficient to establish that it did not have direction or control over the means and manner by which Laycock provided her services is a question of law. *Chelius*, 258 Or App at 81.

The facts do not permit the legal conclusion that Laycock was free from Swift's direction and control over the means and manner of providing services to Swift. To be sure, the facts permit the conclusion that, as to some of those services—namely, the portion described in the parties' written agreement—Swift did not control the means and manner by which Laycock worked. But, in assessing whether Laycock was free from Swift's direction and control for purposes of ORS 670.600(2)(a), we must take into account all of the services that Laycock provided to Swift. As we explained in *AGAT Transport, Inc.*, "it is important to focus on the type of service performed, and consider whether it is *that* service—not the end result—over which the individual providing services is free from direction and control." 256 Or App at 303 (emphasis in original).

Here, Laycock's services for Swift were more expansive than the parties' written agreement indicates. *See Chelius*, 258 Or App at 80-81 (holding written contract is not dispositive of whether person is an employee or an independent contractor, and that that determination is fact specific). In addition to providing the delivery services specified in the parties' written agreement, Laycock also worked in Swift's distribution center for up to 10 hours each week, where Swift required her to unload pallets from a truck, sort the contents of those pallets, and then load the waiting delivery vans. As to those services, Swift controlled the manner in which Laycock provided services by requiring her to report to the distribution center at a fixed time to perform her sorting and loading responsibilities, and requiring her to wear closed-toe shoes, and controlled the means of the work by supplying the equipment and tools to be used in completing that work.

Moreover, the record suggests that Laycock had even more responsibilities at the distribution center. Laycock testified that she was in charge of the pharmaceutical cage

at the distribution center, but Swift developed no evidence about the scope of Laycock's responsibilities in that regard. In addition, Swift's manager testified that the drivers based in Salem managed the warehouse and were responsible for sweeping it, indicating that Laycock may have had additional duties at the distribution center. Absent additional evidence as to the full scope of Laycock's responsibilities at the distribution center, the record is insufficient to permit the legal conclusion that Laycock was free from Swift's direction and control as to the means and manner by which she provided her services to Swift. In other words, because the record does not disclose fully what those services were, it is legally insufficient to establish that Laycock was free from Swift's direction and control in providing them. *See Fireside, Inc.*, 65 Or App at 457 (putative employer did not sustain its burden of proving that musicians were independent contractors in the absence of evidence as to the nature of musicians' activities).

Swift urges us to conclude otherwise. Relying on our decision in *Avanti*, Swift contends that the issue is whether factors suggesting freedom from control "predominate" over factors indicative of control. Assuming that that is a correct reading of *Avanti*, this record is legally insufficient to establish that factors indicative of freedom from control predominate. That is largely because Swift, who—we again emphasize—bore the burden of proof on that matter, did not fully develop the evidence regarding the scope of Laycock's responsibilities at the distribution center.[4] And the evidence that was developed, if anything, tends to indicate that Swift exercised direction and control over the means and manner of that work.

Swift also argues that its requirement that Laycock work at its distribution center was the type of general instruction directed toward specifying the "desired result" of Laycock's services: timely deliveries along her route. The problem with that argument is that Swift, in this instance, did more than specify the results it desired Laycock to

---

[4] In its case in chief, petitioner did not develop the evidence regarding the scope of Laycock's warehouse work. The department elicited that evidence through its examination of Laycock.

achieve. Swift required Laycock to work at the distribution center for up to two hours daily, unloading a truck, breaking down pallets, discharging unspecified duties with respect to a pharmaceutical cage, and then loading her own truck and those of other drivers before she could set out to perform the services addressed in her written agreement with Swift. The requirement that Laycock perform a variety of tasks on Swift's premises at a specific time using Swift's equipment for the purpose of facilitating the deliveries of all drivers, and not just the deliveries that Laycock agreed to perform, goes beyond a "generalized instruction" directed toward the achievement of a particular result. *See Avanti*, 248 Or App at 461.

For the foregoing reasons, the facts found by the ALJ, as supplemented by the uncontroverted evidence in the record consistent with those facts, do not permit the legal conclusion that Laycock was free from Swift's control as to the means and manner by which she provided services to Swift. For that reason, we affirm the decision of the ALJ upholding the unemployment insurance tax assessments against Swift.

Affirmed.